

**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1 212 698 3500  Main
+1 212 698 3599  Fax

_____

**Benjamin E. Rosenberg**
*Partner and General Counsel*

Benjamin.Rosenberg@dechert.com
+1 212 698 3622  Direct
+1 212 698 3599  Fax

October 16, 2025

**<u>VIA EMAIL</u>**

The Honorable Brian Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:   <u>United States v. Howard Rubin, Jennifer Powers, and Stephen Powers</u>,
                 No. 25-CR-281 (BMC)

Dear Judge Cogan:

      Mr. Rubin, through counsel, respectfully submits this letter seeking release from custody on the following proposed bail package:[1]

      a.   A $50 million personal recognizance bond, co-signed by Mr. Rubin, his wife, Mary Henry, and his daughter, Annalee Rubin;

      b.   The bond will be secured by the following funds and unencumbered properties which combined represent approximately $8.6 million in value: (i) $1 million in cash to be deposited with the Clerk of the Court by Ms. Henry; (ii) $5 million in cash to be deposited with the Clerk of the Court by Mr. Rubin;[2] (iii) a home Ms. Henry owns in Connecticut with approximately $1.6 million in equity; and (iv) a residence in Connecticut owned by Mr. Rubin's brother, Jonathan Rubin, where he and his family reside full time, with approximately $1 million in equity;

      c.   Mr. Rubin will provide a written instruction to Crown Global Insurance ("Crown Global")[3] relinquishing his right to access funds from his insurance policy (where

---

[1]     We note that we met and conferred with the government regarding this proposed bail package; however, the government has not consented.

[2]     Mr. Rubin will borrow this money against his insurance policy with Crown Global.

[3]     As described on their website, "[f]or more than 30 years, Crown Global has established a solid track record of structuring U.S. and non-U.S. compliant variable life insurance and annuity policies for high net worth and institutional clients." *About Us*, CROWN GLOBAL INSURANCE GROUP LLC, https://www.crownglobalinsurance.com/ (last visited Oct. 15, 2025). According to their website, "AM



Honorable Brian M. Cogan
October 16, 2025
Page 2

the vast majority of his assets are held) and directing that, during the pendency of this case, any instructions regarding funds derived from the policy must come from a third-party trustee who will monitor the use of funds to ensure they go only toward Mr. Rubin's and his family's regular living expenses (including medical care) and legal fees;[4]

d.   Electronically monitored home detention with travel limited to trips necessary to provide care for his grandchildren in Connecticut, Manhattan to meet with counsel and for medical appointments, and the Eastern District of New York for court appearances;

e.   Installation of security cameras to provide 24/7 monitoring of Mr. Rubin's residence, with real-life monitoring available for pre-trial services, as well as video recording;

f.   Surrender of passport;

g.   No contact with co-defendants or any known witnesses or Jane Does; and

h.   All other standard conditions of pretrial supervision.

This is a substantial and comprehensive bail package, secured by the commitments of multiple family members, for someone who is neither a flight risk nor a danger to the community.[5]

**I.   Applicable Standards**

A court considering an application for bail must undertake a two-step process:  It must determine whether the defendant presents a risk of flight or a danger to the community; if the

---

Best's Review [] ranked its U.S.-based business as one of the top 200 U.S. life/health insurers in 2021 based on 2020 admitted assets."  *Crown Global Ranked as One of AM Best's Review Top 200 U.S. Life/Health Insurers in 2021*, CROWN GLOBAL INSURANCE GROUP LLC, https://www.crownglobalinsurance.com/ (last visited Oct. 15, 2025).

[4]      Mr. Rubin is willing to agree to place any remaining assets and funds under the control of such trustee.

[5]      This proposed bail package is more than sufficient to ensure Mr. Rubin's appearance.  However, to the extent the Court does not find the proposal satisfactory, Mr. Rubin is also prepared to hire a private security service at his expense to maintain 24/7 surveillance under terms to be arranged in coordination with pre-trial services.



Honorable Brian M. Cogan
October 16, 2025
Page 3

Court determines that the defendant presents either a risk or flight or of danger, then it must decide whether there are conditions of release that could reasonably assure the defendant will not flee or endanger others. *See, e.g., United States v. Sabhnani*, 493 F.3d 63, 74-76 (2d Cir. 2007); *United States v. McKenzie*, No. 23-CR-500 (WFK), 2024 WL 2315276 at *2 (E.D.N.Y. May 22, 2024). In determining whether there are acceptable conditions of release, the court must consider the nature and circumstances of the offense charged, the weight of the evidence, the defendant's history and characteristics, and the nature and seriousness of the danger to any person in the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). A district court reviews *de novo* a magistrate judge's decision to release or detain a defendant pending trial. *See McKenzie*, 2024 WL 2315276, at *2 (citing cases).

The government bears the burden of showing dangerousness by clear and convincing evidence, *see United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995), and risk of flight by preponderance of the evidence, *see United States v. Jackson*, 823 F.2d 4, 6-7 (2d Cir. 1987). Because Mr. Rubin is charged with violating 18 U.S.C. § 1591, there is a rebuttable presumption of both risk of flight and dangerousness, and Mr. Rubin bears "a limited burden of production – not a burden of persuasion – to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

Where bail conditions – such as home confinement, ankle monitoring, surrender of travel documents, and co-signing of the bond by family members – reasonably ensure the defendant's appearance in court and the safety of others, the court should grant bail. *United States v. Donziger*, 853 F. App'x. 687 (2d Cir. 2021) (granting bail to a defendant charged with criminal contempt based on bail package including strict pretrial supervision with electronic monitoring and home confinement, a secured $800,000 bond with two co-signors, surrender of all travel documents, ban on new travel documents, and restricted travel to the Southern and Eastern Districts of New York); *United States v. Jackson*, No. 19-CR-356 (ARR), 2020 WL 1905674 (E.D.N.Y. Apr. 17, 2020) (granting bail to a defendant charged with felony possession of a firearm under bail conditions including strict home confinement with location monitoring); *United States v. Paulino*, 335 F. Supp. 3d 600 (S.D.N.Y. 2018) (granting bail to a defendant charged with assault with a deadly weapon in aid of racketeering pursuant to bail package consisting of a $100,000 bond, home incarceration enforced by GPS monitoring, limited travel, and surrender of all travel documents); *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009) (granting bail to a defendant charged with securities fraud, wire fraud, and money laundering subject to a $10 million bond co-signed by defendant's son and mother, home detention with electronic monitoring, and surrender of all travel documents).



Honorable Brian M. Cogan
October 16, 2025
Page 4

**II.    Mr. Rubin Is Not a Flight Risk**

At the initial presentment, the government asserted "there's nothing [] tethering Mr. Rubin to this country" (*see* Sept. 26, 2025 Bail Hearing Tr. 9:10-12, attached here as **Exhibit A**). That statement, which is at the heart of the government's argument for pretrial detention, is categorically false. The fact is, *everything* tethers Mr. Rubin to this country, specifically to the New York metropolitan area.

*First*, Mr. Rubin has lived in the greater New York area since 1982. He has not travelled abroad for business or pleasure, to any location near or far – in almost a decade. His entire family is in the United States, and he does not own any residences outside the United States nor outside of the New York metropolitan area.

*Second*, Mr. Rubin's family ties are profound. Approximately 30 years ago, Mr. Rubin and his wife, Ms. Henry, adopted three infant children, whom they love deeply and with whom they share a close bond. In 1999, at the age of 44 and at the peak of his career on Wall Street, Mr. Rubin made the decision to retire to spend more time with his children, when they were 6, 5 and 3. (*See* Ms. Henry's Character Refence attached as **Exhibit B**). He spent years playing with them, taking them to doctor appointments, the playground, birthday parties and special trips, helping them with homework, and volunteering at their school. (*Id.*) Mr. Rubin was well known as a most devoted parent among teachers, family, adult friends, and the friends of his children. (*Id.*)

Mr. Rubin continues to be a constant presence in his children's lives, and the family continues to be close-knit. Their daughter, Annalee, lives in Connecticut with her partner and three small children (with a fourth expected). Their two sons live in New York City and Texas. Ms. Henry also lives in New York City. In 2021, Mr. Rubin moved to Connecticut to be near his daughter and her family, assuming a vital role in caring for his three young grandchildren. The family relies on Mr. Rubin for childcare on a daily basis, and Mr. Rubin and Ms. Henry have each arranged to care for their daughter's older children (as well as the family's two dogs and cats), when the fourth child arrives. (*See* Annalee's Character Reference attached as **Exhibit C**). Annalee's letter emphasizes how heavily she relies on Mr. Rubin every day, noting that together with Ms. Henry, they provide a loving and stable environment for her children. (*Id.*) Attached to her letter are several photographs evidencing the bond between Mr. Rubin and his grandchildren.[6]

---

[6]    Notably, even the FBI was aware of Mr. Rubin's close relationship with his grandchildren and the significant time he spends with them. When agents arrived at his home to execute his arrest, they first inquired whether his grandchildren were present before entering the premises.

**DECHERT**

Honorable Brian M. Cogan
October 16, 2025
Page 5

Mr. Rubin's dedication as a grandfather is also recognized throughout the community; he brings his grandchildren to swimming and dance lessons weekly, forging strong relationships with instructors and other families. (*See* Character References attached as **Exhibits D-M**.) As their swim and dance instructors note, he is unfailingly present, affectionate, and exceptionally dedicated. (Exs. D, E.) Additionally, Mr. Rubin's brothers and niece recount his lifelong support for those around him and his role as the dependable pillar of the family, always present during hardship. (Exs. F-H.) His commitment to his loved ones—never missing birthdays, graduations, weddings, or family milestones—keeps him deeply connected to his family and this country. (*Id.*)

Neighbors further attest to Mr. Rubin's strong community and family ties, describing him as respectful, friendly, and focused on his family—often seen playing outside with the grandchildren or involved in daily routines. (Exs. I-M.) Collectively, these letters provide powerful proof of Mr. Rubin's deep-rooted presence in his community and his unshakeable commitment to his family. Far from being a flight risk, Mr. Rubin's life is firmly anchored in the United States—now strengthened further by the imminent birth of his fourth grandchild.

The government's claim that Mr. Rubin is "estranged from his wife" (Ex. A, Tr. 9:13) is incorrect. Although there are divorce proceedings pending and Ms. Henry and Mr. Rubin live separate lives, they continue to both care for their children and grandchildren and have made their interests and well-being a priority. Ms. Henry and Mr. Rubin still regularly speak to each other regarding the children and grandchildren and coordinate with each other to support them. (Ex. B). Ms. Henry supports Mr. Rubin's release on bail as her letter to the Court explains. And, as noted above, Ms. Henry is offering not only to co-sign the bond but to secure the bond with a property she owns in Connecticut. (*Id.*) In addition, Mr. Rubin has two brothers (Mr. Rubin is the middle child), who live with their families in Connecticut and New Jersey. One of the brothers is offering his only home as security. His daughter's letter on behalf of Mr. Rubin eloquently attests to the closeness she feels towards her uncle.

*Third*, Mr. Rubin became aware of a pending criminal investigation years ago when he learned that FBI agents were interviewing people about him. As recently as last December, Mr. Rubin's counsel was in contact with prosecutors in the EDNY about the investigation. Mr. Rubin has not fled, moved assets, or taken any steps that would indicate an inclination to flee. To the contrary, in 2017, Mr. Rubin sought the assistance of prosecutors in the Middlesex County Prosecutor's Office, as well as the Manhattan District Attorney's Office, when he was being extorted by someone who threatened to reveal Mr. Rubin's BDSM relationships with certain sexual partners. Mr. Rubin also reported the extortion to the FBI in New York. The individual was eventually convicted. *See State of New Jersey v. Robert A. Aloi*, Compl. Number 1205-W-2017-000988, Police Case #17-01149; *State v. Aloi*, 458 N.J. Super. 234, 204 A.3d 297 (App. Div. 2019), Dkt. A-5669-17T1; Civil Case, Case No. 1:17-cv-06404, Dkt. 206. That Mr. Rubin



Honorable Brian M. Cogan
October 16, 2025
Page 6

initiated contact with law enforcement, revealing the nature of his BDSM activities, evidences his belief that his BDSM encounters were consensual.

*Fourth*, Mr. Rubin's health is another factor that ties him to his community and weighs heavily against flight. Mr. Rubin is 70 years old and recently suffered a stroke and his doctors are all located in the greater New York area. Attached as **Exhibit N** is his hospital visit summary and instructions. He also suffers from high blood pressure and impaired vision, for which he is receiving treatment from a neurology specialist that the Metropolitan Detention Center ("MDC") cannot provide. As a result of his ongoing detention, he will miss previously scheduled medical appointments. He is medicated with blood thinners. His healthcare needs provide further disincentive to flee. The government asserted at the bail hearing that Mr. Rubin "is not suffering from any condition that the MDC and the BOP are not capable of addressing." (Ex. A, Tr. 23:15-16). But suffering a stroke at Mr. Rubin's age is serious, and several courts have recognized that the conditions at the MDC are not fit for pre-trial detention.[7]

*Fifth*, at the detention hearing, the government raised concerns about (a) Mr. Rubin's access to "overseas" accounts, (b) the location of his passport, and (c) eight "phones" found at his home in Connecticut at the time of his arrest. Each of these issues is addressed below, and only further demonstrates that Mr. Rubin is not a flight risk.

---

[7]    *See e.g.*, *United States v. Forbes*, No. 22-CR-97 (RK) (E.D.N.Y.) (noting the court was worried about MDC's conditions as one of the reasons for sentencing the defendant to a non-custodial sentence); *United States v. Colucci*, 743 F. Supp. 3d 452 (E.D.N.Y. 2024) (sentencing a defendant to nine months in prison, but ordering that if BOP designated the defendant to the MDC, the Court would vacate the sentence and resentence to home incarceration); *United States v. Chavez*, No. 22-CR-303 (JMF) (S.D.N.Y. Jan. 4, 2024), Dkt. 31 (describing the conditions at MDC as "dreadful" and "longstanding" and noting that the issues with food contamination and hazardous physical conditions were an "ongoing tragedy"); *United States v. Morgan*, No. 19-CR-209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. 90, Tr. 12-15 (describing the MDC as "dirty," "infested with drugs," and plagued by violence); *United States v. Boyd*, No. 21-CR-486 (SHS), 2022 WL 790771 (S.D.N.Y. Feb. 3, 2022) (describing overcrowding, staffing issues, and lockdowns at the MDC); *United States v. Days*, No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021), Dkt. 35, Tr. 19 (describing MDC conditions as "disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that"); *see also* John Annese, "Inmate at Brooklyn's Troubled Metropolitan Detention Center Is Stabbed To Death," NY DAILY NEWS (Jun. 20, 2024) available at https://www.nydailynews.com/2024/06/20/inmate-at-brooklyns-troubled-metropolitan-detentioncenter-is-stabbed-to-death-sources) (discussing murder of inmate); Fola Akinnibi & Marie-Rose Sheinerman, "Beleaguered Brooklyn Jail Blasted by Candidates in Crowded N.Y. Congressional Race," BLOOMBERG (Aug. 16, 2022), available at https://www.bloomberg.com/news/articles/2022-08-16/ny-10-democratic-candidates-call-onfeds-to-fix-brooklyn-jail) (discussing suicide of at least four inmates in prior three years).



(a)        *"Overseas Accounts"* -- Key to the government's opposition to bail was its allegation that Mr. Rubin "in 2024, [] had almost 75 million in [an] account in the Cayman Islands."  This is not correct.  (*Id.*, Tr. 7:23-24.)  The "account" to which the government refers is a variable whole life insurance policy with Crown Global.[8]

As set forth in the attached affidavit of Mr. Rubin's financial advisor, Mr. Rubin purchased this policy in 1999.  (*See* Dornfeld Aff. ¶ 4 attached as **Exhibit O**.)  It was, therefore, clearly not purchased with the intent to flee.  And as further explained in the affidavit, the policy has both a "death benefit" (payable to Mr. Rubin's heirs upon his death) and a "cash value" component.  By paying amounts into the policy that exceed the premiums required to fund the death benefit, the excess funds may be invested, and Mr. Rubin may borrow against the "cash value" of the policy.  These are common features of variable whole life policies.  (Ex. O, Dornfeld Aff. ¶¶ 4-7.)  Crown Global does not have custody of or manage the underlying investments held in the policy.  (*Id.*)

Since purchasing the policy in 1999, Mr. Rubin has made substantial premium payments, resulting in a peak cash value of approximately $75 million.  That figure, however, does not take into account the loans Mr. Rubin has taken against the cash value of the policy over the decades it has been in force.  The current unencumbered amount available to borrow is approximately $37 million.  (*Id.*)[9]

There is no reason to conclude that this insurance policy evidences an intention to flee.  Nevertheless, to address any concerns the Court may have about Mr. Rubin's access to large amounts of cash, Mr. Rubin is prepared to relinquish his ability to access the cash value in the policy, as well as his other investment accounts, and instruct the insurer only to allow further loans against the policy, and withdrawals from his other investment accounts, to be requested or made by a third-party trustee for the sole purpose of paying for Mr. Rubin's regular living expenses, medical bills, and legal fees.  Similar bail conditions designed to prevent a defendant from accessing or transferring funds or assets are recognized as effective and appropriate measures.  *See, e.g.*, *Sabhnani*, 493 F.3d 63 (adopting limited restraining notice on personal and business accounts as part of pretrial release conditions for defendant charged with forced labor and harboring illegal aliens); *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009)

---

[8]        Separately, the Mary J. Henry Trust holds a Crown Global insurance policy for which Mr. Rubin serves as one of three trustees, alongside his brothers. Mr. Rubin is willing to resign as trustee and before doing so, instruct Crown Global not to issue any funds to any account in his name.

[9]        The Foreign Account Tax Compliance Act ("FATCA") requires disclosure of cash value insurance contracts when the insurance provider is located outside the United States.  The FATCA tax form the government referenced at the bail hearing accurately reported the total cash value of the policy but that figure does not take into account the loans against it.



Honorable Brian M. Cogan
October 16, 2025
Page 8

(adopting injunction to bar defendant from transferring any assets belonging to him or his company as part of pretrial release conditions for defendant charged with securities fraud, investment adviser fraud, mail fraud, wire fraud, international money laundering, concealment of money laundering, transactions in criminally derived property, false statements, perjury, false filing with the SEC, and theft from an employee benefit plan).

(b)  *Passport* -- While the government described Mr. Rubin as being evasive about the location of his passport on the day he was arrested, he was not attempting to withhold it. Faced with a dozen armed agents entering his home, Mr. Rubin was understandably overwhelmed and simply did not immediately recall where his passport was located. This is not surprising – and consistent with his lack of travel and ties to any other country – since, as noted, he has not used his passport in almost a decade. Indeed, more significant than the location of the passport is that it shows Mr. Rubin has not traveled abroad in over eight years. The passport was in his New York apartment, where Ms. Henry lives. He will surrender it immediately.

(c)  *Electronic Devices* -- The government's claim that Mr. Rubin possessed "eight cell phones" (Ex. A, Tr. 7:12) – suggesting a likelihood of using them to evade criminal proceedings – is inaccurate and misleading. Mr. Rubin currently has only one working phone connected to a carrier service, an iPhone 15. That phone was seized by the FBI at the time of his arrest. The remaining seven devices are as follows:

--  Three of the devices the government seized are BlackBerry phones. (*Id.*, Tr. 7:14-15.) They are entirely unusable. [10]

--  The inventory of items seized lists a "white phone." We believe that device is not, in fact, a phone. It is an old iPod 9 – a device used primarily to play music – and also with no cell service connectivity.

--  The other electronic devices the government seized are not in use or even connected to a carrier service that would allow Mr. Rubin to send messages or make calls.

Mr. Rubin simply did not have the habit of discarding old phones, and after the civil action was filed, counsel advised him of his obligation to preserve all electronic communications and instructed him not to discard his old phones. Notably, some of these devices were used by his grandchildren for play, precisely because they are otherwise unusable. The government has

---

[10]  Since January 4, 2022, cellular service providers ceased providing cell service for BlackBerry phones. *See Classic BlackBerry Phones Will Stop Working Jan. 4*, CNN BUS. (Jan. 1, 2022), https://www.cnn.com/2022/01/01/tech/blackberry-end-of-life/.

**DECHERT**

Honorable Brian M. Cogan
October 16, 2025
Page 9

provided no evidence of any illicit purpose related to these devices. That Rubin possessed the devices in no way supports the government's argument that he poses a risk of flight.

*Sixth*, in its letter in support of detention ("Detention Letter") submitted to the Magistrate Judge prior to the bail hearing, the government asserts that in this District, U.S. citizens charged with sex trafficking offenses are frequently detained pending trial. (Dkt. 6, at 8.) Since the bail hearing, we have had the opportunity to review the six cases cited by the government in support of its position. We note that all six cases involved defendants with extensive and serious criminal histories, as well as conduct and facts that are entirely distinguishable from Mr. Rubin's alleged conduct. The conduct in those cases included, but is not limited to, trafficking of minors in open sex markets, attempts to evade law enforcement, use of forged documents, bail jumping, use of false identities, illegal possession of firearms, and criminal impersonation. (*Id.*) In one of the cases, the defendant was not a U.S. citizen. Below is a summary of each case cited by the government:

--    In *United States v. Ferron Facey*, 24-CR-339 (AMD) (E.D.N.Y. Sept. 20, 2024), defendant allegedly recruited young women – including at least one 16-year-old minor – in another state and brought them to New York to work for him in prostitution at an open-air sex market in East New York, Brooklyn. Further, defendant had a long criminal history that includes a violent felony, attempts to evade law enforcement, and convictions involving forged documents. *See* Letter in Opposition to Defendant's Motion for Bail as to Ferron Facey, *United States v. Ferron Facey*, 24-CR-339, Dkt. No. 12 (E.D.N.Y)).

--    In *United States v. Douglas Welch*, 23-CR-411 (MKB) (E.D.N.Y. Oct. 27, 2023), defendant was charged with sex trafficking conspiracy, sex trafficking, interstate prostitution, and promotion of prostitution. Defendant had a "long and violent criminal history," including a felony conviction for criminal possession of a weapon, as well as a history of bail jumping and using a false name. *See* Government's Letter Regarding Detention as to Douglas Welch, *United States v. Douglas Welch*, 23-CR-411, Dkt. No. 15 (E.D.N.Y.)).

--    In *United States v. Michail McKen*, 23-CR-377 (JMA) (E.D.N.Y. Sept. 27, 2023), defendant was charged with forcibly trafficking three victims, as well as interstate prostitution. Further, defendant had a criminal history of illegally possessing firearms, criminal impersonation, driving under the influence of drugs, and larceny, for which he violated the terms of probation and was incarcerated; and at the time of his arrest, defendant refused to exit his vehicle. *See* Letter in Support of Application for Permanent Order of Detention as to



Honorable Brian M. Cogan
October 16, 2025
Page 10

Michail Mcken, *United States v. Michail McKen*, 23-CR-377, Dkt. No. 6
(E.D.N.Y. Sept. 27, 2023).

--    In *United States v. Timothy Bullen et al.*, 22-CR-494 (JS) (E.D.N.Y. Nov. 2,
2022), defendants were charged with sex trafficking conspiracy, managing a drug
premises, and distribution of proceeds of prostitution and narcotics. In terms of
criminal history of the defendants, one had a felony conviction and three
misdemeanor convictions, and violated court orders, including probation. *See*
Letter regarding Detention as to Jigar Dadarwala, Narendarakuma Dadarwala,
Shardaben Dadarwala, Ashokbhai Patel, *United States v. Timothy Bullen et al.*,
22-CR-494, Dkt. No. 13 (E.D.N.Y. Nov. 2, 2022). Further, one of the defendants
was not a United States citizen and law enforcement had lodged an immigration
detainer on him, making flight an especially present risk. *Id.*

--    In *United States v. Napoleon Scott et al.*, 22-CR-156 (MKB), (E.D.N.Y. Mar. 10,
2022), defendants were charged with sex trafficking conspiracy, sex trafficking,
promotion of prostitution, interstate prostitution, and witness tampering. One
defendant had a significant criminal history, including six prior felony
convictions and two misdemeanor convictions for violating orders of protection
in favor of one of the victims by violently assaulting her. *See* Letter regarding
detention as to Napoleon Scott, *United States v. Napoleon Scott et al.*, 22-CR-
156, Dkt. No. 4 (E.D.N.Y. Mar. 10, 2022). He was charged with witness
tampering for assaulting, strangling, and intimidating a female victim, and was
arrested while serving a custodial sentence at Riker's Island. *Id.*

--    In *United States v. Jefferson Clay et al.*, 24-CR-455 (ERK) (E.D.N.Y. Feb. 5,
2025), defendants were charged with interstate prostitution, including, allegedly
transporting two minors, a 14-year-old and a 15-year-old girl, to work as
prostitutes on the open air sex market in Brooklyn. See Letter Opposing
Defendant's Appeal of Detention as to Jamerson Jamille Clay, *United States v.
Jefferson Clay et al.*, 24-CR-455, Dkt. No. 40 (E.D.N.Y. Feb. 5, 2025). Further,
evidence was found on one of the defendant's phones that they were continuing
to traffic underage victims when they returned to Texas. *Id.*

Mr. Rubin has no criminal history, and, as discussed below, the alleged conduct involves
private activity between adults that concluded more than six years ago. Furthermore, in the
Second Circuit, defendants charged with similar offenses, such as possession of child
pornography and forced labor, have been granted bail subject to, *inter alia*, home confinement
and electronic monitoring. *See, e.g.*, *United States v. Arzberger*, 592 F. Supp. 2d 590, 592



Honorable Brian M. Cogan
October 16, 2025
Page 11

(S.D.N.Y. 2008) (granting bail to defendant charged with possession and receipt of child pornography, subject to bail conditions including electronic monitoring, restrictions on contact with potential witnesses, and a prohibition on possessing firearms, destructive devices, or other dangerous weapons); *Sabhnani*, 493 F.3d at 78 (granting bail to defendants charged with forced labor, subject to bail conditions including electronic monitoring and strict home confinement); *see also United States v. Gardner*, 523 F. Supp. 2d 1025 (N.D. Cal. 2007) (granting bail to defendant charged with conspiracy to engage in sex trafficking of minor and sex trafficking of minor, subject to bail conditions including home confinement with electronic monitoring). In addition to the other bail conditions, home confinement and electronic monitoring are more than sufficient here to reasonably assure Mr. Rubin's return to court.

*Seventh,* the government's assertion in its Detention Letter that electronic monitoring is insufficient to mitigate the risk of flight here – suggesting Mr. Rubin would cut his ankle monitor – is unpersuasive. The cases relied upon by the government are distinguishable, as they involve foreign defendants and charges stemming from extensive criminal histories, evasion of authorities, and drug addiction.

--    In *United States v. Maxwell*, defendant was charged with conspiracy to entice and actually enticing minors to travel to engage in illegal sex acts, conspiracy to transport and actually transporting minors to participate in illegal sex acts, and two charges of perjury. 510 F. Supp. 3d 165, 173 (S.D.N.Y. 2020). Defendant also was found to have "substantial international ties and multiple foreign citizenships," including French citizenship, and familial and personal connections abroad. *Id.* Further, the government noted that "the French Code of Criminal Procedure 'absolutely prohibits' the extradition of a French national," making flight risk even greater. *Id.*

--    In *United States v. Svetlana Dali*, 24-MJ-645 (JAM) (E.D.N.Y. Dec. 5, 2024), defendant was charged with boarding a plane at JFK Airport as a stowaway, without a boarding pass, and traveled to Paris, France. *See* Complaint as to Svetlana Dali, *United States v. Svetlana Dali*, 24-MJ-645, Dkt. No. 1 (E.D.N.Y. Dec. 5, 2024). Further, the Court noted that defendant "[did] not have family or community ties within this district (or, for that matter, within this country) . . . her past conduct . . . coupled with her representation to the Court that her family is in Europe, suggest[ed] that [she would] continue her evasive behavior when presented with the opportunity." *United States v. Dali*, No. 25-CR-14 (JAM), 2025 WL 97658, at *6 (E.D.N.Y. Jan. 25, 2025).



-- In *United States v. Horst Jicha*, 23-CR-342 (OEM) (E.D.N.Y. Aug. 23, 2023), defendant, charged with fraud and money laundering, was a German citizen who lived in Brazil and Spain and only started visiting the United States in 2017 to promote his company. *See* Sealed Indictment as to Horst Jicha, *United States v. Horst Jicha*, 23-CR-342, Dkt. No. 1 (E.D.N.Y. Aug. 23, 2023).

-- In *United States v. Tony Clanton*, 23-CR-328 (KAM) (E.D.N.Y. July 25, 2023), defendants were charged with conspiracy and actual Hobbs Act Robbery. Defendants each had a serious criminal history, including gun violence, home invasion robbery, and attempted shooting. *See* Letter in support of the government's application for detention as to Tony Clanton, Lawrence Dotson, *United States v. Horst Jicha*, 23-CR-342, Dkt. No. 4 (E.D.N.Y. July 25, 2023).

-- In *United States v. William Bartell*, 22-CR-80 (EK) (E.D.N.Y. Feb. 28, 2022), defendants were charged with conspiracy and actual bank robbery. Defendant released on conditions suffered from heroin addiction and other medical conditions, frequently requiring medical care. *See United States v. William Bartell*, 22-CR-80, Dkt. Nos. 18, 19, 36, 37 (E.D.N.Y. Feb. 28, 2022).

-- In *United States v. Joey Macario*, 22-CR-342 (HG) (E.D.N.Y. July 27, 2022), defendants were charged with conspiracy to commit access device fraud. The defendant who violated terms of release suffered from drug addiction and required inpatient and outpatient treatment frequently throughout the proceedings. *See United States v. Joey Macario*, 22-CR-342, Dkt. No. 8 (E.D.N.Y. July 27, 2022).

Mr. Rubin has no ties to foreign countries, no history of drug addiction, and no criminal record. The suggestion that he would remove his ankle monitor and flee the country is unfounded.

### III.    Mr. Rubin Is Not a Danger to the Community

Mr. Rubin is not a danger to the community. *First*, as noted, Mr. Rubin has no criminal history, and the claimed "dangerous" conduct is alleged to have taken place more than six years ago (Counts One through Nine). There is no ongoing threat, and the nature of the allegations on its own is not sufficient to detain him pre-trial. A "bond determination [that] . . . only consider[s] the seriousness of [a defendant's] criminal convictions without looking at the recency of the convictions or [his] subsequent behavior" is improper. *Blandon v. Barr*, 434 F. Supp. 3d 30, 40 (W.D.N.Y. 2020). Where the conduct "occurred nearly seven years ago," like here, even if



Honorable Brian M. Cogan
October 16, 2025
Page 13

"serious, does not show that it is highly probable that [defendant] currently poses a threat to the community." *Id.*; *see also United States v. Santa*, No. 86-CR-303, 1986 WL 6832, at *4 (E.D.N.Y. May 6, 1986) (finding "pretrial detention [was] not warranted" where alleged threat to witness was "made two years" before and there was no "specific evidence that [defendant was] likely to threaten or harm the witnesses, if released"). That the investigation has gone on for well over three years after the conclusion of the trial in the civil case strongly indicates that the government did not believe that there was an imminent threat to the safety of the community.

*Second*, none of the charges in this case or assertions in the government's Detention Letter reflect any conduct by Mr. Rubin that posed a risk to the community at large. The conduct at issue involved adult women who chose to engage in BDSM sexual encounters with Mr. Rubin in exchange for money. The bail conditions proposed and public nature of his case will serve as strong deterrents against similar behavior – even if he were so inclined, which he has not been for many years.

*Third*, one of the factors that the Court must consider in rendering a bail decision is the weight of the evidence against the defendant. *See* 18 U.S.C. § 3142(g). The Court is of course aware of the civil case involving largely the same allegations (and some of the same plaintiffs/alleged victims) against Mr. Rubin. While Mr. Rubin was found liable on some of the allegations in that case, he is challenging it on appeal, on both legal and factual grounds.

In particular, he is challenging the sufficiency of the evidence of coercion. In support of that challenge, he has pointed to extensive evidence that some of the plaintiffs visited him multiple times, including after the allegedly coercive incidents, and that their behavior and communications are inconsistent with the notion that they were coerced or tricked into engaging in sexual relations with Mr. Rubin. Although the Court presided over the civil case and is familiar with some of the evidence relevant here, that evidence was evaluated under a significantly lower standard of proof. For the Court's convenience, we also highlight several points that should be considered under the heightened criminal standard – beyond a reasonable doubt:

--    One of the Jane Does the government references in its Detention Letter and indictment who was also a civil plaintiff continued to send provocative messages, photos, and videos, and repeatedly invited him to participate in BDSM activities *after* the incident she alleges exceeded her consent.

--    Another of the civil plaintiffs, also a Jane Doe identified in the Detention Letter and indictment, similarly sent Mr. Rubin provocative pictures and messages proactively seeking BDSM encounters with him before and *after* the incidents she alleges exceeded her consent.



Honorable Brian M. Cogan
October 16, 2025
Page 14

-- Another civil plaintiff further identified as a Jane Doe in the Detention Letter and indictment, likewise messaged Mr. Rubin stating that she loved being dominated and repeatedly expressing her enjoyment of her encounters with Rubin.

-- Further, one of the non-plaintiff Jane Does the government identified in the Detention Letter and indictment sent Mr. Rubin explicit photographs of herself in BDSM attire prior to their meeting, and following their single encounter she continued to communicate with Mr. Rubin by text. Only ten days after their encounter, she sought another encounter with Mr. Rubin.

*Finally,* in its Detention Letter and argument to the Magistrate Judge at the initial detention hearing, the government made several allegations in support of detention that cannot be credited.

The government referred to purported evidence that Mr. Rubin spoke about finding a "hit man" on the dark web to eliminate witnesses against him. The Magistrate Judge stated that while she did "not know the degree of the evidence," because the allegation came from a "specific witness . . . it sound[ed] like there's specific information as to the use of the dark web . . . it [did] not appear to be speculation." (Ex. A, Tr. 26:5-11.)

Respectfully, we submit that before finding for the government on such a significant allegation, the Magistrate Judge should have inquired into the "degree of evidence" supporting this claim. Following the bail hearing, we requested to see any evidence the government has related to this claim.[11] We note the following:

-- Mr. Rubin adamantly denies ever arranging, or even considering arranging, for a hitman, and denies making any such statement to anyone. This allegation is illogical, particularly given that he was aware of an ongoing federal investigation concerning him.

-- The statement remains attributed solely to an anonymous source, and is thus inherently unreliable;

-- The statement was made to law enforcement in February 2024, many years after Mr. Rubin allegedly made these comments; the passage of time of course undermines the reliability of the witness's claim;

---

[11] We note our appreciation to the government for sharing this information with us before it made complete discovery.



Honorable Brian M. Cogan
October 16, 2025
Page 15

--        The government did not produce any evidence that Mr. Rubin "had looked on the dark web" – whatever that is – for anything, let alone a hitman;

--        The fact that so far as we are aware the government took no actions with respect to Mr. Rubin until his arrest on September 26, 2025, further indicates that it did not seriously credit this report of Mr. Rubin's dangerousness.

We would submit that before this Court relies on this hearsay allegation, the Court should require the government to present the witness for testimony and allow for cross-examination to test the reliability of the claim.

The same applies to the government's referenced approaches to witnesses in a trial to influence them. (*Id.*, Tr. 26:5-20.) As the Court knows, not once, did a witness testify about this alleged threat. There was also not a single complaint made to Mr. Rubin's counsel about this allegation or anything remotely similar. We believe that had this Court learned of any such threat, it would have immediately addressed it, but there is no evidence of the same. Absent specific evidence of recent misconduct, pretrial detention is not warranted. *See e.g.*, *Santa*, 1986 WL 6832, at *4.

The government further alleges that Mr. Rubin made a "threat" to one of the Jane Does— who was not a plaintiff in the civil case – in a January 2019 letter, warning her against bringing a lawsuit against him. (Ex. A, Tr. 19:10-13.) The allegation is misleading, as the "threat" in question was not one of physical harm. Rather, Mr. Rubin sent a letter intended to dissuade the Jane Doe from filing a lawsuit by stating that, if she pursued legal action, he would defend himself by testifying about her voluntary participation in commercial sex and BDSM activities— information that would become part of the public record. Notably, prior to sending the letter, Mr. Rubin showed it to his counsel, and he did not believe that anything about this letter was improper. The proposed bail conditions which restrict his travel and forbid Mr. Rubin from communicating with any complainant would, in any event, prevent such communications.

The same holds true for the hearsay statement offered by the government that Mr. Rubin hacked certain individuals' accounts. (*Id.*) If the Court intends to rely on any of these hearsay allegations, Mr. Rubin respectfully requests an evidentiary hearing to allow for evaluation of the credibility of the sources and statements, and to require the government to substantiate its claims.

**IV.    <u>Conclusion</u>**

This bail package provides reasonable assurances of Mr. Rubin's appearance in court. The record demonstrates that Mr. Rubin is a 70-year-old retiree with deep roots in the United



Honorable Brian M. Cogan
October 16, 2025
Page 16

States, strong family ties, significant medical needs, and no criminal history or overseas connections.  The conduct alleged involves private, adult activity that, even by the government's allegations (which Mr. Rubin contests), ended over six years ago.  With substantial financial security posted – including multiple properties – and strict pretrial supervision conditions, the proposed bail terms are more than sufficient to ensure his return to Court.  For these reasons, and in the interest of justice, Mr. Rubin respectfully urges the Court to grant his release under the enhanced bail conditions proposed.

Dated: New York, New York
      October 16, 2025

Respectfully Submitted,

DECHERT LLP
By: /s/ *Benjamin E. Rosenberg*
Benjamin E. Rosenberg
Edward A. McDonald
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Tel.: (212) 698-3500
Fax: (212) 698-3599
benjamin.rosenberg@dechert.com
edward.mcdonald@dechert.com

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Michael J. Gilbert
Katherine Anne Boy Skipsey
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Tel.: (212) 653-8700
Fax: (212) 653-8701
mgilbert@sheppardmullin.com
kboySkipsey@sheppardmullin.com

CC: All Counsel of Record