

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MEF:TBM/RSB
F. #2017R01960

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 19, 2025

By Email and ECF

The Honorable James R. Cho
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Howard Rubin
               Criminal Docket No. 25-281 (BMC)

Dear Judge Cho:

        The government respectfully submits this letter in opposition to the defendant Howard Rubin's application for bail dated October 16, 2025. See ECF No. 40 ("Motion" or "Mot."). For the reasons discussed below; in the government's detention letter dated September 26, 2025, see ECF No. 6 ("Detention Letter" or "Ltr.") (attached hereto as Exhibit A and incorporated by reference); and at oral argument on September 26, 2025, see Exhibit B ("Tr."), after which the Honorable Peggy Kuo found no condition or combination of conditions that could reasonably secure the defendant's appearance in court as required or the safety of the community, the Court should likewise deny the defendant's bail application on the same grounds.

I.      Background

        The government incorporates by reference the factual and procedural background sections from its Detention Letter, including defined terms therein. See Ltr. at 1-8.

        In sum, for at least a decade between 2009 through 2019, the defendant, co-defendant Jennifer Powers ("Powers") and others operated an extensive network whereby they recruited women to fly to New York to engage in BDSM sex with Rubin in exchange for money, often relying on force, fraud and coercion to cause the women to engage in Rubin's desired sex acts. For much of the relevant period, the defendant leased a Penthouse, in which he transformed

a bedroom into a sex Dungeon where many of the criminal sex acts occurred. The defendant saw different women for commercial sex multiple times a week, including on consecutive days. During these encounters, the defendant brutalized the women's bodies, often beyond any consent they had given—punching, whipping, penetrating and electrocuting them—causing them significant pain and bruising, and at times requiring medical treatment. The defendant and his co-conspirators used threatening and coercive measures to keep the women silent and to protect the trafficking network.

On September 17, 2025, the defendant was indicted for sex trafficking by force, fraud and coercion, for trafficking Jane Does #1-6, in violation of 18 U.S.C. § 1591(a); transporting Jane Does #1, 2, 4 and 7-10 in interstate commerce for prostitution, in violation of 18 U.S.C. § 2421(a); and bank fraud, in violation of 18 U.S.C. § 1344.[1] ECF No. 1.

II.     Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In evaluating the defendant's dangerousness and risks posed to safety, the Act considers the risk that the defendant will "obstruct justice, or threaten, injure, or intimidate . . . . a prospective witness or juror," or attempt to do the same. 18 U.S.C. § 3142(f)(2)(B). Moreover, as to dangerousness and safety, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

A rebuttable presumption of dangerousness and risk of flight arises when a defendant is charged with a violation of 18 U.S.C. § 1591, as here. 18 U.S.C. § 3142(e)(3)(D). The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(3). To rebut this presumption, the defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this limited burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of evidence that the defendant presents a risk of flight. Id.

To determine whether conditions of release can reasonably assure the defendant's appearance and the safety of the community, the Court must consider: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the defendant; (3) the

---

[1] On September 30, 2025, a superseding indictment was returned, but no new counts were added as to the defendant. ECF No. 21.

history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse, and past conduct; and (4) the nature and seriousness of the danger to the community or to an individual that would be posed by release. See 18 U.S.C. § 3142(g). If a defendant meets his or her burden of production relating to dangerousness and risk of flight, the presumption in favor of detention does not disappear but remains a factor for the court to consider. Mercedes, 254 F.3d at 436.

>Under 18 U.S.C. § 3142(f), a bail hearing
>
>may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

During detention hearings, the government may proceed by proffer and the rules of evidence do not apply. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) ("It is well established in this circuit that proffers are permissible both in the bail determination and bail revocation contexts."); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) ("[T]he government may proceed by proffer."); see also 18 U.S.C. § 3142(f) (noting that the rules of evidence do not apply).

III.     The Prior Bail Application & Detention Hearing

On September 26, 2025, the defendant was arraigned before Judge Kuo, and requested bail on a $25 million personal recognizance bond, secured by an $8 million apartment in Manhattan that the defendant co-owned with his estranged wife Mary Rubin ("Mary") and in which she lived, in addition to the surrender of his passport and travel restrictions. Additionally, as reflected in the Pretrial Services Report, Mary was willing to co-sign the defendant's bond. Following an extensive detention hearing—addressing virtually all of the arguments the defendant raises in the present application—Judge Kuo found no condition or combination of conditions could reasonably secure the defendant's appearance in court or the safety of the community, and a permanent order of detention was entered. Tr. 26-28; ECF No. 11.

A.     The Government's Argument

At the hearing, the government opposed the application, because the defendant is both a danger to the community and a flight risk. As to danger, the government emphasized "[t]he defendant for years brutalized women even when they asked him to stop and even when they were unconscious," id. at 5; the trafficking network was extensive, involving "ten Jane Doe[s]," "dozens of other victims," and "at least ten other individuals" on whom the defendant relied "to recruit women and to facilitate his crime," id. at 6; the defendant was undeterred by the Civil Case filed in 2017—he trafficked Jane Doe #6 in 2018, and continued to traffic Jane Doe #7 during 2019, id.; and his financial crimes continue to this day, including through his most

3

recent tax filings with the Internal Revenue Service ("IRS") in August 2025, in which he failed to disclose millions of dollars he has paid to Powers and her family, id. at 6-7.

Further, the government identified five examples of the defendant and his co-conspirators engaging in obstruction of justice and witness tampering. See Ltr. at 5-6. Specifically: (1) after two victims got into a fight at the Penthouse and the police arrived, Powers "told a victim to lie to the police to protect [Powers and the defendant's] names which that victim did," id. at 5;[2] (2) the defendant "attempted to bribe another victim" to convince her to drop a lawsuit that threatened to expose the defendant's conduct, id.; (3) "he threatened to publicly shame Jane Doe [#]5 when he learned she was going to be bringing a case against him and to pursue sanctions," id. at 5-6; (4) "[h]e hired a private investigator to investigate" some of the victims, and a number of victims reported to law enforcement that "they thought they had been followed and that their accounts had been hacked," id. at 6, 18-19; and (5) "Jane Doe [#]7 informed the government that the defendant told her that he had endeavored to find a hitman on the dark web, that he succeeded in making contact with that person to target the victims of the civil case but did not ultimately pursue it," id. at 6, 19.

As to flight risk, at the time of the defendant's arrest, he "would not tell law enforcement where his passport was," and he possessed eight cellphones, and specifically three Blackberries ("[p]erhaps those were old") and five iPhones, which suggested "he's switching cell phones to evade detection," id. at 7; he had "very significant assets overseas," including $75 million in the Cayman Islands, and that there was "absolutely no transparency as to" his overall wealth, id. at 7-8, 22; he had been unemployed for years, was living alone in Connecticut, and his wife had filed for divorce from him years prior, removing impediments to "pick up and flee to a country that does not extradite," id. at 9; and, as to his health, he was deemed fit for confinement and was not suffering from any ailment the Bureau of Prisons ("BOP") could not address, id. at 23.

Further, the government emphasized the defendant's brazen lies. For one, he lied to a bank in support of his application to co-sign Powers's mortgage, falsely claiming he was not party to litigation while he was in fact deeply "embroiled in civil litigation"—indeed he perpetuated that lie in April 2022, just days after testifying at the jury trial in the Civil Case. See id. at 8. Additionally, he lied to Pretrial Services about his drug use, claiming to have used "cocaine once about ten years ago, ecstasy twice between ten and twenty years ago, and

---

[2] In the Civil Case, that victim testified that Powers instructed her to lie to the police about who leased the Penthouse, to discard the drugs in the Penthouse, and to leave Powers and the defendant's names out of the ensuing lawsuit, in exchange for which the defendant would pay for the victim's lawyer, all of which she did. She testified to that account both on direct and cross examination.

marijuana once while in college," see Pretrial Services Report, in direct contradiction to text messages and other evidence in the government's possession, Tr. at 23.[3]

Finally, the government emphasized the strength of the evidence and the severe penalties the defendant faced, which first became a reality for the defendant on the day of his arrest. Tr. at 21-22. The defendant was found liable of civil sex trafficking in the Civil Case, and his testimony in that case established his guilt of interstate transportation for prostitution as charged in Counts Three through Seven here, each of which carries a statutory maximum penalty of 10 years. Id. at 8. The defendant's guilt of the bank fraud charge, for which he faces a statutory maximum penalty of 30 years, is also "overwhelming." Id. And there is "incredibly powerful" evidence of the sex trafficking charges, including the accounts of the many Jane Doe victims, "financial records, text messages," and "videos and images," among other evidence. Id. at 8-9. The defendant faces a mandatory minimum sentence of 15 years' imprisonment on those counts, and the government estimates his U.S. Sentencing Guidelines range to be 325 to 405 months' imprisonment. Id. at 9.

B.   The Defendant's Argument

By contrast, the defendant argued he was not a danger because he was a 70-year-old man with no criminal history, id. at 14; the "principal conduct[] took place in the years before 2019," "[t]here's been no harm to any person certainly since that date," and other than the bank fraud charge from 2020 to 2022, "there is no allegation of any wrongdoing" since then, id. at 14, 25; and he is simply alleged to have "mistreated women who were known to him," not "strangers," id. at 14.

As to obstruction and witness intimidation, the defendant claimed, "there's no evidence of any witness intimidation or threats to any, or credible threats, to any witness or victim." Id. at 15; see id. at 20 (arguing there is "insufficient evidence of any threat to any witness"). Referencing the plaintiffs in the Civil Case, he contended "none of these people was intimidated. All of them were able to testify." Id. at 15. Further, he argued it was proper to hire a private investigator and that offers of "payoffs to settle cases are absolutely appropriate." Id. at 18, 21. And as to the threatening letter to Jane Doe #5, it did not threaten "violence or harm," but rather "[i]t was threatening that [if she pursued litigation against the defendant], her practice and backgrounds would be exposed to the public." Id. at 21. As to the defendant's endeavors to find a hitman, the defendant dismissed the allegation as "hearsay" and suggested that "[i]f there

---

[3]   See, e.g., Dec. 2, 2014 emails between Powers and the defendant (Powers stating, "Ask [victim] to buy some drugs while she's here…I will also ask her for the number! HA!!" and Rubin replying, "Everyone wants pot in the condo!"); Oct. 20, 2016 text messages between Powers and the defendant (the defendant noting there had been a "[l]ittle bit of coke!" the prior note and Powers commenting later that morning, "6 cops showed up" to the Penthouse, "I'm very surprised I wasn't arrested for drugs all over the condo"). All errors contained in quoted language are original unless otherwise indicated.

5

was any evidence of that happening or [that] he searched on the web, the government could get that evidence and there's absolutely no suggestion that it has." Id. at 17, 20.

He further argued he was not a flight risk because he "continue[s] to be amicable" with his wife and they "interact with one another throughout the week," id. at 11; he spent time with and cared for his children and grandchildren, id.; he had a relationship with his two U.S.-based brothers, id.; he had no family or ties overseas and had not traveled abroad in eight years, id. at 11-12; according to him he "has been aware of this investigation for almost a year, certainly since late 2024, and he has never remotely made any effort to avoid it, evade it, or to escape," id. at 12; his money in the Cayman Islands is in his life insurance policy with Crown Global (the "Rubin Policy"), which was established 25 years ago, and which only had equity of $35 million, id. at 12-13, 24; and he was "under the care of doctors" and taking medication, "which makes him especially unlikely to leave and to flee," id. at 13-14. As to the location of his passport, he noted "he did tell Pretrial Services and stated that it's located in his apartment in Manhattan." Id. at 16. Finally, the defendant addressed only the strength of the sex trafficking counts (as he again does here), by referencing the fact he was appealing the finding of liability against him in the Civil Case. Id. at 15.

  C.  Judge Kuo's Findings and Order of Detention

Judge Kuo found the defendant had not overcome the presumption of detention, that the defendant presented both a danger to the community and a risk of flight, and "that there are no conditions or set of conditions that will ensure Mr. Rubin's appearance in court or the safety of the community." Id. at 25-28.

The court noted the "very serious set of criminal allegations against Mr. Rubin that spanned several years," with "multiple victims" and "very volent behavior," for which he faced "very serious criminal penalties should he be found guilty on one of these, let alone on multiple counts." Id. at 25. Further, "[t]he evidence as set forth does appear to be strong," which included, among other things, the factual record from the Civil Case. Id. at 25-26.

Additionally, the court noted that "the multiplicity of the threats and attempts to obstruct justice show me that Mr. Rubin continues to be, or poses a threat to the community that cannot be addressed by any bond condition." Id. at 26. The defendant had directly contacted witnesses in the context of litigation, id. at 21, and there was an allegation concerning efforts to find a hitman "from a specific witness" with "specific information as to the use of the dark web. So it does not appear to be speculation," id. at 26. As to the defendant's claim that witnesses were not in fact intimidated, the court found, "the fact that the witness came to court and testified anyway speaks more to their strength and their courage than to any attempts to intimidate them." Id. at 17.

The court was "very concerned about the risk of flight," including the defendant's refusal "to turn over his passport or at least tell them where it was," and expressed skepticism that the defendant did not know where his passport was located. Id. at 27. The defendant's possession of "several cellphones in boxes" demonstrated the defendant's "state of mind . . .

6

which is that he is planning or trying to evade something." Id. at 27.  As to the defendant's assets in the Cayman Islands, "whether it's $75 million or $35 million, [it] is a lot of money offshore and so it does show that he has an ability to access money that could enable him to flee and go someplace else and evade the authorities." Id.  Finally, the court dismissed any suggestion that the defendant's prior awareness of an investigation was somehow an indication he would not flee.  "[B]eing arrested really focuses a person's mind and makes it real." Id.

Accordingly, the court entered a permanent order of detention.  ECF No. 11.  The defendant has been detained at the Metropolitan Detention Center ("MDC") since that time.

IV.     The Current Bail Application

On October 16, 2025, the defendant filed a bail application,[4] requesting bail on the following conditions, in addition to the standard conditions:

- $50 million bond, signed by him and two suretors—Mary and his daughter;

- Posted security valued at $8.6 million, comprised of: $5 million in cash from the defendant; $1 million in cash and a $1.6 million home owned by Mary; and a $1 million home owned by the defendant's brother;

- Installment of a third-party trustee to oversee and restrict disbursement of funds from the Rubin Policy;[5]

- "Electronically monitored home detention";

- "Installation of security cameras to provide 24/7 monitoring" of his residence, with "real-life monitoring available for pre-trial services";

---

[4] On October 10, 2025, defense counsel presented a proposed bail package to the government, which differs from that presented in the Motion, to which the government did not consent.  Accordingly, the defendant's assertion that his counsel had met and conferred with the government regarding the current package is inaccurate.  See Mot. at 1 n1.  Likewise, the defendant did not furnish any of the affidavits or supporting material to the government in connection with the earlier discussions, and defense counsel declined the government's request that he furnish records supporting what the defendant reports to be his financial position.

[5] The Rubin Policy is an extremely valuable life insurance policy held with Crown Global in the Cayman Islands.  Although the defendant's accountant asserts that the policy's investments are "almost exclusively in the United States," ECF No. 40-15 ¶ 6, that is irrelevant.  The defendant's interest is not in the underlying investments, but the policy itself, which is held in the Cayman Islands.  Indeed, when the defendant takes loans against the policy, he does so through the Cayman Islands, and receives money through Cayman banks.

- Surrender of his passport; and

- No contact with his co-defendants, or "known witnesses or Jane Does."

See Mot. at 1-2. The defendant further expressed a willingness to "hire a private security service at his expense to maintain 24/7 surveillance," id. at 2 n.5, a measure the Second Circuit has resoundingly rejected in these circumstances, see United States v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019).

For the reasons discussed below, in the Detention Letter and at the prior bail hearing, the proposed package should be rejected because it will not reasonably assure the defendant's appearance in court as required or the safety of the community.

V.   The Defendant Should Continue to Be Detained Pending Trial

The defendant claims—wrongly—that he is neither a flight risk nor a danger because, in sum, he has strong family ties that will prevent him from fleeing; he has not made efforts to flee, nor will he; he is ill; the government's proffer was insufficient to evidence he obstructed justice and tampered with witnesses or will do so in the future; and the core criminal conduct ended in 2019 and did not harm the community at large. None of these arguments has merit—indeed, they were rejected by Judge Kuo during the first bail hearing. And they do not rebut either the presumption, or the evidence presented by the government demonstrating by clear and convincing evidence that the defendant is a danger to the community and by a preponderance of the evidence that he is a risk of flight. Accordingly, the Motion should be denied, and the defendant should continue to be detained pending trial.

A.   The Defendant's Family Will Not Deter His Criminal Conduct or Flight

The defendant does not dispute that he is unemployed, lives alone in a rental home in Connecticut, and is in the middle of divorce proceedings with his wife Mary, but nonetheless claims that he is not a flight risk because his family lives in the United States, his "family ties are profound," he is a caretaker to his grandkids, and "[h]is commitment to his loved ones—never missing birthdays, graduations, weddings, or family milestones—keeps him deeply connected to his family and this country." Mot. at 4-5. In support of that assertion, the defendant appended letters to the Motion from his family, friends and acquaintances. In fact, what the evidence shows is that the defendant had hidden from his family and friends his true character, and at no time did the fact of having a family deter him from extensive and sustained criminality, nor will it do so now.

As to the defendant's character, see 18 U.S.C. § 3142(g), it is unremarkable that he may have treated his family and friends with kindness, as most people do. That does not change the troubling fact that for at least a decade, the defendant brutalized women, often while they were gagged and restrained in his locked Dungeon, helpless to make the violence stop. Instead, what these affidavits show is that the defendant was duplicitous, living a double life.

8

During the relevant period, the defendant saw women multiple times a week at the Penthouse, often day after day. See, e.g., Jul. 13, 2015 email from the defendant to Powers ("I might see someone EVERYDAY this week, (except thurs)."); Nov. 18, 2015 text messages between Powers and Jane Doe #1 (noting another woman was staying at the Penthouse the day before Jane Doe #1 was flying in to have commercial sex with the defendant, "so I need to coordinate carefully"). The defendant concealed from his wife that he had leased the Penthouse and frequently lied to her about his whereabouts. See, e.g., Nov. 18, 2014 emails between the defendant and Powers (discussing lies the defendant could tell Mary to explain his whereabouts); Dec. 19, 2014 email from the defendant to Powers ("By the time we go to the rockettes, dinner and dungeon, it will be 2am, -so its easier to tell mary im away rather than come in so late"); Jan. 21, 2015 email from the defendant to Powers ("I probably see 5 girls the week of the 16th!! Except the 16th is holiday and my anniversary!"); Aug. 2015 emails from the defendant to Powers (indicating that he would be sleeping at the Penthouse with different women and that the defendant falsely told Mary he had stayed overnight at the Dream hotel).

The evidence also belies any suggestion that the defendant was a devoted family man, as he now claims. He regularly flouted obligations to his wife and children to pursue BDSM sex with other women. See, e.g., Feb. 16, 2015 email from the defendant to Powers (discussing his plans for the week of his anniversary, including with "the two 21 yr old sluts" one day and with Jane Doe #1 the other, and his dilemma in having to be home with his son but wanting to see a different woman at the Penthouse later in the evening); Feb. 24, 2015 emails between the defendant and Powers (laughing about the time the defendant and Powers slept together in the defendant's marital bed); Apr. 6, 2015 email from the defendant to Powers (noting that on April 8, he would be seeing "FREAKO" at the Penthouse "from 5-7, then meeting [son] and mary [at] Lincoln center for Lord of the Rings"); Jun. 22, 2015 email from the defendant to Powers ("[Woman-1] 'owes me' a quickie, so I think I might see her from 5-7pm . . . [Son's] home by himself, so I would really make it short. Mary would murder me!"); Jan. 29, 2016 text messages between Powers and Co-Conspirator-1 discussing Jane Doe #10 ("They went out after we finished[.] H was supposed to be home around 9 bc Mary was flying in, but he didn't get home till after midnight.").

Moreover, at no time between 2019 to 2022 was the defendant deterred from criminal conduct by virtue of having a family, and the defendant gives the Court no reason to believe that the circumstances have changed now. Indeed, the defendant has more incentive than ever to tamper with witnesses and to flee from prosecution now that he is faced with the strength of the government's case and the reality of a severe sentence. The government outlined the strength of the evidence in its Detention Letter at 10-11, and Judge Kuo likewise found that the evidence was strong, Tr. at 25-26. Tellingly, the defendant makes no effort to rebut the incontrovertible evidence of his guilt for transporting women interstate for prostitution or bank fraud, for which he faces statutory maximum sentences of 10 years and 30 years, respectively.

Accordingly, the defendant faces a fundamentally different calculus now than he did before his arrest. Given the strength of the evidence, the very real prospect that he will live out the rest of his life in prison, and the fact that at no time during the relevant period did the

9

presence of his family dissuade him from criminality, the Court should take no comfort in the prospect of the defendant's family anchoring him to the United States to fight these charges or deterring him from witness tampering.[6]

      B.      <u>The Defendant's Significant Wealth Overseas, Multiple Cellphones, and Refusal to Provide His Passport Demonstrate He is a Flight Risk</u>

The defendant further claims that he is not a flight risk because he "became aware of a pending criminal investigation years ago when he learned that FBI agents were interviewing people about him," that "last December Mr. Rubin's counsel was in contact with prosecutors in the EDNY about the investigation," and—according to the unsworn, uncorroborated assertion of his lawyers—he has "not fled, moved assets, or taken any steps that would indicate an inclination to flee." Mot. at 5.

To be clear, defense counsel was not in an ongoing dialogue with the government about the extent and nature of the investigation. That the defendant may nonetheless have suspected that he was being investigated is a far cry from the reality of being under federal indictment. As Judge Kuo explained, "being arrested really focuses a person's mind and makes it real." Tr. at 27. Thus, that he did not previously have sufficient incentive to flee has no bearing on whether he does so now. The government submits the strength of the case against him and the prospect of a prison sentence of at least 15 years and up to life provides a powerful incentive to flee. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence."); United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (finding maximum sentence of 15 years "sufficient to provide him with a strong incentive to flee").

Next, the evidence strongly suggests that the defendant is well positioned, to flee. For one, the defendant concedes that the majority of his assets are overseas, in the Rubin Policy in the Cayman Islands. See Tr. at 13. According to his accountant, that policy is valued at $76.3 million, and the current amount available to borrow against it is approximately $37 million. See ECF No. 40-15 at ¶ 8. As discussed further below, the defendant has since revealed he has access to a second policy with Crown Global, see ECF No. 40-15 ¶ 9, which the government knows to likewise have a significant dollar value. As Judge Kuo recognized, on the belief then that the defendant only had access to $35 million overseas, "[that] is a lot of money offshore and

---

[6] Confusingly, the defendant claims that his willingness to appeal to law enforcement when he was being extorted "evidences his belief that his BDSM encounters were consensual." Mot. at 5-6. Yet, he could have been under no misapprehension that prostitution was legal in New York, so, as a general matter, the fact of his own criminal conduct did not seem to dissuade him from outreach to law enforcement when he thought it would benefit him.

so it does show that he has an ability to access money that could enable him to flee and go someplace else and evade the authorities." Tr. at 27.

Additionally, at the time of the defendant's arrest, he was found to be in possession of seven cellphones.[7] The defendant claims he had "only one working phone connected to a carrier service, an iPhone 15," that the remaining phones were "not in use or even connected to a carrier service," and the fact of the other phones simply reflected that he "did not have the habit of discarding old phones." Mot. at 8. That is patently false. Two of the cellphones were iPhone 16 Pros—newer models than what the defendant claims to be his current cellphone—and they were still in their boxes. See EDNY_00000016-17 (inventory of seizure). Indeed, one was hidden inside a tent box. Moreover, that they were not presently connected to a carrier is irrelevant—the fact of the defendant maintaining multiple iPhones, including two new iPhones, evidences his intent and ability to switch to those phones if and when the need arose, which he could easily use with WiFi without ever connecting to a carrier. As Judge Kuo found, "this information also shows [the] state of mind of Mr. Rubin which is that he is planning or trying to evade something." Tr. at 27.

Finally, the defendant incredulously claims—for the first time in his Motion, and through the unsworn statements of his lawyers—that at the time of his arrest, "he was not attempting to withhold" his passport, but "simply did not immediately recall where his passport was located." Mot. at 8. Again, that is patently false. When asked where his passport was, he did not say he could not recall but instead refused to tell law enforcement. He remained with law enforcement for hours, and at no time disclosed its location to them. Only during his Pretrial Services interview did he did reveal its location. As Judge Kuo found, that conduct likewise evidences an intent to flee. See Tr. at 27.

C. The Defendant's Medical Condition is No Impediment to Flight

Further, the defendant claims he is not a flight risk because he "suffered a stroke," "his doctors are all located in the greater New York area," and he is being treated for "high blood pressure and impaired vision." Mot. at 6.

Yet, the defendant's medical records, dated July 2025, indicate that following his stroke, he was discharged to "Home or Self Care," had no dietary restrictions, could engage in activity as tolerated, and his treatment involved taking two new medications. ECF No. 40-14.

---

[7] The government advised Judge Kuo that the defendant had eight cellphones, including three Blackberries that may have been old, and five iPhones. See Tr. at 7. The defendant correctly notes that one of the devices the government believed was an iPhone is in fact an iPod, see Mot. at 8, and specifically a 7th generation iPod Touch. According to Apple, that iPod has many of the same built-in applications as an iPhone, including: Messages, FaceTime, Mail, Safari, Camera and Photos. See https://support.apple.com/en-us/111961. A preliminary review of that iPod indicates it indeed had the applications FaceTime and Messages installed, and that it contains email and web history data, among other things.

11

The defendant makes no effort to explain why his condition is so acute, and treatment plan so novel, that they cannot be adequately addressed by doctors outside the United States should he flee. And any suggestion that the defendant's medical condition is debilitating is also flatly belied by his claim, elsewhere in his Motion, that he engages in the active care of his grandchildren. See ECF No. 40-3 (describing defendant's routine with his grandchildren); ECF No. 40-7 ("The energy he has with three small children is remarkable for a seventy year old grandfather.").

The defendant also fails to offer any evidence to support his claim that the MDC cannot treat his condition. Further, relying on decisions from 2020, 2021 and 2024—including the Honorable Jesse M. Furman's decision in United States v. Chavez, No. 22-CR-303 (JMF) (S.D.N.Y. Jan. 4, 2024), Dkt. 31—the defendant contends that "the conditions at the MDC are not fit for pre-trial detention." Mot. at 6 & n.7. Those dated opinions do not reflect the present state of the MDC. As Judge Furman himself recognized on May 14, 2025:

> With respect to other arguments made in the defense's submission, on the MDC front, I'm certainly more than familiar with the circumstances at the MDC, and the place has still much need for improvement, but it is also a lot better than it was in January of last year when I wrote my opinion in United States v. Chavez that is cited in the defense's submission. As it happens, I just came from a meeting involving representatives of the MDC and got [the] latest statistics, which is that staffing is up to 75 percent, the medical services staff is significantly higher and fully staffed among nurses, the incidents of violence went from 42 in December, which was a rather significant number, to only nine in April; all of which is to say it's not nearly as bad as it was a year and a half ago and it's definitely trending in the right direction.

United States v. Reshard, No. 24 CR 392 (JMF) (S.D.N.Y. May 14, 2025) (filed at United States v. Burgos, No. 24 CR 650 (LTS) (S.D.N.Y.), ECF No. 10 at 6).

Thus, the defendant's medical condition is not an impediment to his flight, and it can be appropriately addressed at the MDC.

    D.    <u>The Defendant Has a Demonstrated History of Witness Tampering</u>

The defendant repeats the meritless claim from the first detention hearing that there is insufficient evidence that he threatened or tampered with witnesses. See Mot. at 14-15; Tr. at 17, 20. He also demands an evidentiary hearing, see Mot. at 15, in contravention of Second Circuit precedent allowing the government to proceed by proffer at detention hearings, see LaFontaine, 210 F.3d at 132 (finding court appropriately ordered detention based on government's proffer of defendant's witness tampering).

12

In its Detention Letter and at oral argument, the government proffered five examples of the defendant attempting to threaten and tamper with witnesses. See Ltr. at 5-6; Tr. at 5-6, 19. The government identified, by reference to Jane Doe numbers, who had provided the information, and quoted from text messages between the defendant and Powers, and a letter the defendant had sent to Jane Doe #5, clearly evidencing his efforts at obstructing justice and tampering with witnesses. As Judge Kuo found, "the multiplicity of the threats and attempts to obstruct justice show me that Mr. Rubin continues to be, or poses a threat to the community that cannot be addressed by any bond condition." Tr. at 26.

Incredulously, the defendant attempts to dismiss those efforts as appropriate measures. At the hearing, he claimed it was proper to hire private investigators, notwithstanding the government's proffer that victims reported being followed and having their accounts hacked, see Tr. at 18-19; he claimed it was proper to offer "payoffs" to settle claims, notwithstanding that the government's proffer was that those payoffs were referred to in a message between the defendant and Powers as a "bribe," see Tr. at 21-22; and he dismissed the threatening letter sent overnight to Jane Doe #5 parents' house, as merely "threatening that . . . if she did [pursue litigation against the defendant], her practice and backgrounds would be exposed to the public," see id. at 20-21. See also LaFontaine, 210 F.3d at 135 (affirming detention for dangerousness where defendant engaged in witness tampering that did not involve threats of violence, because "the harm to the integrity of the trial is the same no matter which form the tampering takes"). Shockingly, defense counsel claims that they sanctioned the letter the defendant sent directly to Jane Doe #5, on the precipice of litigation, pressuring her to drop her lawsuit by emphasizing the embarrassing testimony he intended to elicit and the sanctions he would pursue. See Mot. at 15. The defendant's unwillingness to recognize that these overtures constitute blatant efforts to pressure, threaten, harass and intimate victims and witness demonstrates that he will not abide by any condition of release precluding him from engaging in the same conduct in connection with his criminal matter, where the stakes are significantly higher.

Finally, the defendant wrongly argues that the proffer of him finding a hitman is "attributed solely to an anonymous source, and is thus inherently unreliable." Id. at 14. The government repeatedly attributed the information to a specific victim, Jane Doe #7, whose identity is known to law enforcement. See Ltr. at 6; Tr. at 19-20; ECF No. 1 ¶ 3 (describing the Jane Does as "individuals whose identities are known to the Grand Jury"). The government produced two witness statements to counsel reflecting in-person meetings between Jane Doe #7 and the Federal Bureau of Investigation on two different dates, during which she confirmed that the defendant endeavored to find a hitman on the dark web, succeeded in making contact, but he did not ultimately pursue it, and that Jane Doe #7 was willing to testify to as much. See EDNY_00000001-15. The defendant's baseless suggestion that there must be documentary evidence of his use of the dark web ignores the fact that criminals use the dark web precisely because it makes their criminal activity difficult to trace and detect. Moreover, whether the defendant followed through with his stated intent, the threat alone creates fear in victims and witnesses, as the defendant must have known. Thus, as Judge Kuo found, that information supports a finding of the defendant's dangerousness.

The foregoing presents clear and convincing evidence that the defendant will "obstruct justice, or threaten, injure, or intimidate . . . a prospective witness," or attempt to do the same, see 18 U.S.C. § 3142(f)(2)(B), making him an ongoing threat to identifiable individuals and the community at large, which Judge Kuo appropriately found "cannot be addressed by any bond conditions," Tr. at 26.

### E. The Defendant's Criminality was Extensive, Caused Lasting Harm, and Continues to This Day

Next, the defendant argues he is not a danger because the "claimed 'dangerous' conduct is alleged to have taken place more than six years ago"; the charged conduct could have harmed only those "who chose to engage in BDSM sexual encounters with Mr. Rubin in exchange for money" and not the broader community; and the fact he was not arrested sooner "strongly indicates that the government did not believe that there was an imminent threat to the safety of the community." Mot at 12-13. None of these arguments has merit.

Incredulously, the defendant describes the charged conduct as comprising "private activity between adults," and likens his case to one involving "possession of child pornography." Id. at 10. That conduct involved the punching, sodomizing and electrocuting of women beyond any consent, sometimes past the point of consciousness, in disregard of their pleas that he stop, causing them significant pain, bruising and trauma, and on several occasions causing such damage to women's bodies that they required medical treatment. That conduct was extensive, spanning at least a decade and involving at least ten accomplices. And that conduct caused enduring trauma, physical and emotional, to the defendant's victims and their loved ones.

The defendant's criminality did not end after he was sued in the Civil Case in 2017—he trafficked Jane Doe #6 in 2018 and continued to engage in criminal sex acts with Jane Doe #7 through 2019. Moreover, he engaged in bank fraud in 2020 through 2022, and he has continued to lie to the IRS through at least August 2025. See United States v. Dupree, 833 F. Supp. 2d 241, 254-55 (E.D.N.Y. 2011) (recognizing that financial crimes and economic harm can evidence dangerousness). Moreover, for the reasons discussed above, the defendant presents a serious ongoing risk of obstruction of justice and witness tampering. See Millan, 4 F.3d at 1048 (rejecting the argument that "only threats to particular, specified witnesses provide a basis for detention" and finding detention appropriate in the face of prior credible threats to witnesses generally). Accordingly, any suggestion that the defendant has lived a law-abiding life since 2019 and does not present an ongoing danger to the community is flatly belied by the record.

Finally, the defendant wrongly argues that the government could not have believed he was a threat or else it would have immediately arrested him upon the conclusion of the Civil Case in 2022. The government has an obligation to diligently investigate its case before bringing charges, no matter how dangerous the target, which the government did here. Many of the Jane Does in the government's case were not party to the Civil Case. Moreover, given the nature of the crime—and what victims have had to endure and attempt to move past— it should not be at all surprising that victims may be reluctant to come forward, even many years after the conduct has ended.

14

Here, the defendant's history provides powerful evidence that he has and will continue to engage in criminality, to the detriment of identifiable victims and the community. Accordingly, he should be detained pending trial.

### F. The Proposed Bail Package Will Not Reasonably Assure the Safety of the Community or the Defendant's Appearance as Required

The instant package differs from that presented to Judge Kuo, principally, in that: the bond amount is $50 million, not $25 million; the bond will be co-signed by the defendant's wife and daughter, not just his wife; the bond will still be secured by approximately $8 million of assets, but different assets; the defendant will submit to GPS monitoring; and he will implement measures of questionable efficacy to apparently derail his ability to withdraw money from the Cayman Islands.

For the foregoing reasons, the Court should find that there is no condition or combination of conditions that will reasonably secure the defendant's appearance in court as required or the safety of the community. Even assuming the Court entertained a bail package, the Court should find that the defendant's proposal is woefully insufficient because, among other things: (1) there is no transparency as to the defendant's actual financial picture, about which he has already lied, and thus no ability to evaluate the deterrent effect of the bond; (2) the bond conditions will nonetheless leave his family (with whom he claims to have the strongest of ties) with access to tens of millions of dollars; (3) it is questionable that the government could even recover the bond amount, given that the family appears to have secured most of their assets overseas; and (4) the defendant's proposed measures do little to prevent him from cutting an ankle monitor.

First, the defendant has given the Court no ability to evaluate whether the instant package is indeed "substantial," see Mot. at 2, because there is no transparency as to the defendant or his family's actual financial situation. See United States v. Sabhnani, 493 F.3d 63, 77 (2d Cir. 2007) ("[T]he deterrent effect of a bond is necessarily a function of the totality of a defendant's assets."). According to the defendant's unsworn statements to Pretrial Services, his net worth is $49 million, comprised largely of the Rubin Policy, which he valued at $35 million, and a $10 million home he co-owns with Mary (in which she lives, and which counsel has elsewhere valued at $8 million). On October 10, 2025, the defendant declined the government's request that he provide records to corroborate his financial situation.[8]

---

[8] Instead, in support of his Motion, he furnished an affidavit from his accountant that speaks only to two policies with Crown Global. See ECF No. 40-15. Notably, the defendant, Powers and Stephen Powers have been lying to this accountant (who prepares all their tax returns) for years. For example, the accountant was interviewed by law enforcement and revealed that he had no awareness that the defendant was paying Powers and her family millions of dollars. Accordingly, even the defendant's accountant has an incomplete picture of the defendant's financial situation.

15

Notably, the defendant has already lied about his financial situation. On October 10, 2025, counsel falsely represented to the government that the Rubin Policy was the only foreign policy to which the defendant had access. They specifically noted that Mary had a life insurance policy (the "Mary Policy"), but the defendant did not have access to that policy. Then, the government informed counsel that it had seen the defendant taking tens of millions of dollars of loans from <u>three</u> different Crown Global account numbers during the relevant period, not just the Rubin Policy.[9] Only then did counsel disclose that the defendant was in fact a trustee of another Crown Global policy (the "Trust Policy"). Given the piecemeal nature of the defendant's financial disclosures, which have also been inaccurate, and his refusal to furnish supporting records, the Court should have no confidence that these three Crown Global policies reflect the entirety of the foreign assets which the defendant or his immediate family can access. <u>See generally</u> <u>Sabhnani</u>, 493 F.3d 63 (discussing detention hearings involving U.S. citizens charged with forced labor, during which defendants and their account produced 15,000 pages of corroborating material).

Second, even if the defendant relinquishes any control of the Rubin Policy <u>and</u> resigns as a trustee of the Trust Policy, his family still has access to tens of millions of dollars in the Cayman Islands. His two brothers will continue to be trustees of the Trust Policy and Mary will continue to hold the Mary Policy. Although they have not disclosed a dollar value of these policies, according to Foreign Bank and Financial Account records, the Trust Policy had a maximum dollar value of $20.2 million in 2024 and the Mary Policy had a maximum dollar value of $56.6 million in the same year. Accordingly, even if all the proposed bond conditions were imposed, Rubin's immediate family—with whom the defendant elsewhere claims to have the closest of relationships—will continue to have access to tens of millions of dollars in the Cayman Islands. The Court should take no comfort that the family will not access those accounts for the defendant's benefit upon his flight.

Third, although the defendant, his wife and his daughter apparently agree to co-sign a $50 million bond, there is no evidence that the government could recover that amount if and when the defendant fled, beyond the $5 million cash the defendant would have posted; the $1 million cash and $1.6 million property Mary would have posted (in addition to the $8 million Manhattan home in which she lives); and the $1 million home his brother would have posted—totaling $16.6 million, in addition to whatever other domestic assets they may have.[10] Those sums are not meaningful in the context of a family with tens of millions of dollars stashed in the Cayman Islands. Nor should the Court take any comfort that the defendant will be dissuaded from fleeing simply because his wife would lose approximately $10 million in domestic assets in

---

[9]     For example, between 2014 through 2025, the defendant received approximately $63.5 million from Crown Global, from three different Crown Global account numbers. Those funds were deposited into U.S. bank accounts that Rubin used to support his trafficking network.

[10]    The defendant has provided no information concerning his daughter's assets, domestic or foreign.

16

light of all that he has already made her endure, and the fact of her access to a nest egg overseas in the form of the Mary Policy.

Finally, the defendant's proposed measures—home detention with electronic monitoring, security cameras with 24/7 monitoring inside his home available to Pretrial Services, and surrender of his passport—will not prevent the defendant from fleeing. As the Honorable Alison J. Nathan recognized, "home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start." United States v. Maxwell, 510 F. Supp. 3d 165, 172 (S.D.N.Y. 2020) (internal quotation marks and citation omitted); see Ltr. at 11 n.3 (detailing numerous examples of defendants in the District who have cut their ankle monitors and fled after surrendering their passports). As to the security feed, what it would show is that the defendant went outside—it would not prevent him from leaving, nor would it give law enforcement any indication of where he went or how. The defendant's offer to hire a private security team should likewise be rejected. As the Second Circuit explained in United States v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019), "the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendant are released to self-funded private jails," as the defendant would have here.

In sum, the defendant's bail package should be rejected.

VI.   Conclusion

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's bail application, because there is no condition or combination of conditions that will reasonably assure his appearance in court as required or the safety of the community.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/
Tara McGrath
Raffaela Belizaire
Assistant U.S. Attorneys
(718) 254-6454

Enclosures

cc:   Clerk of Court (by ECF)
      Counsel of Record (by ECF)