

**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1 212 698 3500  Main
+1 212 698 3599  Fax

**Benjamin Rosenberg**
*Partner and General Counsel*

Benjamin.Rosenberg@Dechert.com
+1 212 698 3622  Direct
+1 212 698 0495  Fax

December 16, 2025

**VIA ELECTRONIC FILING**

The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    <u>United States v. Howard Rubin and Jennifer Powers, CR No. 25-281 (BMC)</u>

Dear Judge Kuo:

This letter is respectfully submitted on behalf of defendant Howard Rubin in response to the government's letter opposing bail dated December 10, 2025 (the "December 10 Letter").  We write to address briefly some of the issues raised in the December 10 Letter.

> ### I.    There is No Allegation that Mr. Rubin Engaged in Any Conduct Involving BDSM Since 2019

There is no allegation that Mr. Rubin engaged in any BDSM activity since 2019.  He has been living in Connecticut for years, devoted to the care of his grandchildren.  There is no basis to conclude that he would pose any danger to the community if released on the stringent conditions we have proposed.

> ### II.    The Evidence in the Civil Trial Undermines the Government's Argument That Mr. Rubin Faces the Certainty of Conviction for Sex Trafficking

The government's statement in the first paragraph of its opposition that the Second Circuit affirmed Mr. Rubin's "conviction" is wrong.  The recent Second Circuit decision pertained to the civil case and therefore did not involve a conviction.  While the jury in that case found Mr. Rubin liable for violating the Trafficking Victims Protection Act ("TVPA"), he was found not liable on state law claims of assault, battery, false imprisonment, and infliction of emotional distress.  With the exception of one plaintiff, the jury awarded punitive damages of $120,000 to each plaintiff, despite hearing evidence of Mr. Rubin's substantial net worth.  The remaining plaintiff was awarded $250,000 in punitive damages.  It is fair to infer from this outcome that, even under the



The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
Page 2

civil standard of preponderance of the evidence, the issues were not clear cut.  This criminal case, of course, requires the government to meet the highest burden, proof beyond a reasonable doubt. The government's assertions that it is a foregone conclusion that Mr. Rubin will be convicted and face an exceedingly long sentence, and therefore he has every reason to flee, must be rejected.

In fact, the record from the civil trial underscores the weaknesses in the government's case. For instance, the woman referred to in the Superseding Indictment as Jane Doe #1 testified in the civil case that she had a consensual BDSM relationship with Mr. Rubin *for seven years*.  Her claim in the civil case was that in three encounters during this period, Mr. Rubin exceeded her consent. She acknowledged that, after these three encounters, she proactively sought to engage in further encounters with Mr. Rubin.  Jane Doe #1 testified as follows:[1]

- "[Jane Doe 1], you had a consensual BDSM relationship with Howard Rubin for years, correct? A. That is correct."

- "Nobody ever forced you to get on an airplane to come to New York and meet with Mr. Rubin, correct? A. That is correct."

- "In fact, [Jane Doe 1], you yourself purchased some of the BDSM toys that you used in your encounters with Mr. Rubin, correct? A. That is correct."

- "So how would you describe your encounters with Mr. Rubin on those two occasions? A. They were wonderful. We had a lot of fun together."

- "And then you wrote [after the last time she had an encounter with Mr. Rubin, "Hey Sexy! Im in town tomorrow . . . would love to see you . . ."], 'These big tits are dying to be smacked. Winky face emoji.' Correct? A. Correct."  In her text to Mr. Rubin, she continued:  "It's been too long. ( . ) ( . ) my big tits want it badly . . . I'll be in town wed-fri if ur around. U missed mi bday last week would love to see u love link if uraround . . ."

Similarly, contrary to the government's assertion that Mr. Rubin misled women about the extent of BDSM involved in the encounters (ECF No. 52 at 3), communications between Jane Doe #10 and Mr. Rubin prior to their first meeting demonstrate otherwise.  As shown in the following text messages, Mr. Rubin explicitly described the types of BDSM he would engage in, to which Jane Doe #10 responded enthusiastically, expressing her desire to be dominated.

---

[1] Text communications have been quoted verbatim, including any typographical errors.



The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
Page 3

- Rubin to Jane Doe #10: ". . . so w submissive activity, i love to be with girls that love being dominated and enjoy both physical and verbal humiliation. it is a very intense experience, most girls i've been with seem to love it, but i want you to understand completely b4 we get together. there's bondage, spanking (your ass, pussy, tits), use of whips and paddles. vibrators and dildos, nipple and clit clamps."

- Jane Doe #10 to Rubin: "im so game!! I love being dominated."

While the government portrays the use of NDAs as pernicious, the fact is those documents stated in plain English that BDSM can be hazardous and cause injury, asking women to acknowledge that: "In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with (Rubin) including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person."

The government's account of Jane Doe #6 is likewise contradicted by her own communications before and after her single encounter with Mr. Rubin. The government references purported improper comments by Mr. Rubin about rape and the movie "Beauty and the Beast." Jane Doe #6 knowingly agreed to a BDSM encounter and sent Mr. Rubin explicit photographs prior to meeting, including one in which she wore BDSM attire and a prominent collar while crawling on a bed. Following their encounter, Jane Doe #6 herself invoked the "Beauty and the Beast" theme, sending Mr. Rubin an image depicting gagged and tied Disney princesses. Most notably, just ten days after the encounter in which she claims to have feared for her life, Jane Doe #6 sought another meeting, texting Mr. Rubin about making her own travel arrangements to New York and seeing him while there. He declined to see her again.

Years after the alleged non-consensual encounter involving Jane Doe #2, she actually arranged the encounter with Jane Doe #6. However, Jane Doe #2 initially offered to have a sexual encounter herself with Mr. Rubin. He declined. Then, Jane Doe #2, offered to arrange for Mr. Rubin to meet another woman and asked whether he wanted regular sex or play like they used to do. She then told Mr. Rubin she missed him "so much it hurts."

The fact that many Jane Does voluntarily sought and engaged in further encounters after the alleged non-consensual incidents underscores that a conviction is far from a foregone conclusion. The Court should not rely on the government's assertions—taken out of context and contradicted by the evidence—to deny bail.

### III.    The "Secreted Stacks of Cash" Were Insubstantial

The government makes a great deal of "secreted stacks of cash," ECF No. 52 at 11, but does not make any representation about the amount of cash in Mr. Rubin's home at the time he was



The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
Page 4

arrested. The government apparently did not regard the cash as evidence as it was not listed on the inventory of the search. Mr. Rubin kept a few thousand dollars in cash at his home to pay for tips or similar uses, all of which have no connection to any efforts to flee. As the government repeatedly has noted, what he did not have with him in Connecticut was the one item he would need if he intended to flee: his passport.

## IV.   The Allegations of Witness Intimidation Are Unsubstantiated and Speculative

The government makes much of the fact that Rubin hired private investigators as recently as April 2025. ECF No. 52 at 7, 21. There is nothing improper about hiring investigators, especially when one is the subject of numerous actual or threatened civil lawsuits. And the government's statement that "[w]omen who were not party to any litigation reported believing they were being followed and having their online accounts hacked," is too speculative to be probative. *Id*. at 21. There is no suggestion of why the women believed they were being followed, whether they were in fact being followed, whether their "online accounts" had in fact been hacked, when or by whom.[2]

Additionally, the government's assertions regarding statements allegedly made by Mr. Rubin about a "hitman" are not credible. The government itself concedes that there is no evidence

---

[2] The government notes that Mr. Rubin sent a letter to Jane Doe #5 when he learned that she was contemplating suing him, noting that any such suit would inevitably reveal that she had agreed to engage in BDSM sex with him in exchange for money. ECF No. 52 at 7. The government also notes that Rubin's current lawyers "blessed" the letter and states that this was "[i]n violation of longstanding rules of professional conduct." *Id*. at n.3.

First, the communication was not threating. Second, Rule 4.2(a) provides that a lawyer may not communicate with a person whom "the lawyer knows to be represented by another lawyer in the matter." Comment 8 to the rule provides that "[t]he prohibition on communications with a represented party applies only in circumstances where the lawyer knows that the party is in fact represented in the matter to be discussed. This means that the lawyer has actual knowledge of the fact of the representation; but such knowledge may be inferred from the circumstances." The lawyers who advised Mr. Rubin in connection with the letter did not have actual knowledge that she was represented by a lawyer in connection with her threatened action against Mr. Rubin, nor were they aware of circumstances from which such knowledge could have been inferred. **In fact, it was not until approximately nine months after the letter was sent that a lawyer first representing Jane Doe #5 contacted counsel for Mr. Rubin. Jane Doe #5's lawyer never mentioned any improper contact with his client or suggested that he had been representing Jane Doe #5 for many months. The government's assertion that counsel violated ethical rules is reckless and without support.**



The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
Page 5

Mr. Rubin ever hired a hitman or took any steps to do so.  This inflammatory allegation is based solely on what Jane Doe #7 told FBI agents in 2024 concerning comments she claims Mr. Rubin made in 2019.  According to the Form 302s produced by the government, Jane Doe #7 first mentioned Mr. Rubin's alleged "hitman" comments during a February 2024 interview, stating that he "once made comments" about a hitman and purportedly claimed to have searched the "dark web" for one.  The 302 indicates there were no follow-up questions or investigative actions taken by the government at that time. Months later, in August 2024, Jane Doe #7 again referenced the topic in an interview with the FBI, this time claiming Mr. Rubin "implied" interest and asked someone else about hiring a hitman, specifying a price of $850,000.  If the government genuinely believed Mr. Rubin was capable of such conduct, it defies belief that they would have waited another year and a half before arresting him.

Remarkably, Jane Doe #7 herself texted Mr. Rubin in July 2023, notifying him that people were getting knocks at their doors regarding Mr. Rubin—clearly referencing the FBI investigation. She stated:

- "Hi. I know you probably still hate me but are you okay?? I got some weird info recently about stuff you have going on and people getting knocks at their door."

As part of their conversation, Mr. Rubin updated her on his life, stating:

- "I live in CT now. Close to my daughter and my one yr and three yr old grand kids and spend a lot of time w them. I don't talk or really communicate w any woman . . . . I really don't do much except grandkids, play online poker and drink good wine every night. I see some friends and my brothers occasionally. Pretty quiet life."

Jane Doe #7 responded that it was so exciting regarding the grandkids, that she was working at a big law firm, and:  "Was in Vegas this weekend! Made me think of all our trips!"  Moreover, Jane Doe #7's mother maintained an amicable relationship with Mr. Rubin and, in 2024, reached out to him unprompted, engaging in conversation, including banter about the New York Rangers hockey team.

We respectfully submit that the Court should give no weight whatsoever to the government's unsupported claims regarding the alleged "hitman" statements.

## V.    The Allegations that Mr. Rubin has Used His Wealth in an Attempt to Obtain Preferential Treatment at MDC are Unfounded

The government's assertion that Mr. Rubin has used his wealth to obtain preferential treatment at Metropolitan Detention Center (MDC) (ECF No. 52 at 23) is entirely unsupported.



The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
Page 6

The government has not provided any evidence that payments were made for, or resulted in, preferential accommodations or transfers within MDC.  In fact, Mr. Rubin has continuously remained on the same floor at MDC since his arrival.

### VI.    The Proposed Bail Package is More than Substantial to Assure the Safety of the Community and Rubin's Appearance in Court

The government argues that the $70 million bond, secured with $37.6 in cash and property, is not substantial for the Rubin family.  ECF No. 52 at 24.

As noted by the government in its December 10 Letter, Mr. Rubin's Crown Global Account has a reported cash value of $38.8 million.  However, the government overlooks a crucial detail: $25 million of the cash security posted for the bond will be funded by a loan taken against this policy.  As a result, the cash value of Mr. Rubin's policy will be reduced to approximately $13 million.  By converting much of the policy's cash value into liquid cash security for the bond, these funds become immediately accessible to the government.  This arrangement directly addresses the government's stated concern about recovering from the Crown Global account and ensures the government has ready access to substantial funds in the event of forfeiture.

### VII.    Although Mr. Rubin's Bail Package is More than Sufficient, Mr. Rubin Will Adopt Even More Restrictive Bail Conditions

The government's opposition cites favorably to *United States v. Sabhnani*, 493 F.3d 63, 79 (2d Cir. 2007).  To the extent the Court deems it necessary and appropriate, Mr. Rubin, in the alternative, is prepared to adopt the conditions imposed in that case.  These added conditions are as follows:

- A Court-appointed, independent accountant will review Mr. Rubin's assets, including, but not limited to, all financial accounts owned or controlled personally by Mr. Rubin, and provide the Court with an accurate summary of the status of the accounts that will include a listing of current balances and an estimated worth of the assets;

- All accounts reviewed and summarized by the independent accountant will be restrained by properly filed orders which will permit transfers to take place for authorized purposes, including, but not limited to medical, living expenses, defense costs including attorney's fees and the costs necessary to implement the conditions of home detention.  All transfers exceeding $10,000 shall be subject to the approval of the independent accountant;



The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
Page 7

- The conditions of home detention will be monitored by a private investigator firm. All costs associated with this monitoring will be paid by Mr. Rubin, pursuant to an engagement agreement executed by Mr. Rubin and approved by the government;

- Mr. Rubin will maintain one hard line telephone and one hard line fax, to be electronically monitored by the private investigator. This monitoring will be done in real time by the private investigator and will be the equivalent of an electronic wiretap authorized by Court order. All conversations (except for those with counsel) will be recorded. Mr. Rubin will not have cell phones and his wireless accounts will be closed or suspended for the duration of the detention;

- The private investigator will monitor and record all of Mr. Rubin's computer activity from a single desktop computer located in the residence with a single internet connection. The telephone capability of the computer will be disabled. The private investigator will compare images of the authorized desktop at the beginning of the assignment and at random, unannounced times, thereafter, to determine if violations of bail conditions have occurred.

    *See* 493 F.3d at 79-81.

## VIII.    The Deed of Trust and the Trustee Services Agreement

The government expressed concerns about the proposed arrangements to put an independent trustee in place. We attach as **Exhibit A** to this letter a copy of the proposed deed of Trust. The government's concern that the trustee, Mr. Strachman, would continue funding Mr. Rubin even if he absconds is unfounded. *Id*. at 26. Mr. Strachman is an independent, experienced fiduciary with no personal or professional ties to Mr. Rubin or his family. See ECF No. 51 at 8. It is highly speculative—and unsupported by any evidence—to suggest that a reputable trustee would risk his professional standing and violate the law to assist Mr. Rubin's flight. In any event, we will include a specific provision in the trustee services agreement prohibiting such payments.

## IX.    Additional Information About the Crown Global Policies to Address Concerns

The government expressed several concerns regarding the Crown Global policies held by Mr. Rubin and his family. ECF No. 52 at 25-26. First, to address the government's concern over lack of insight into the policies, we have provided copies of the policies to the government.

Second, the government asserts that there is a discrepancy regarding the loans taken out against the Crown Global policies, noting that their records show $63.5 million in disbursements



The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
Page 8

from banks in the Cayman Islands to Mr. Rubin's accounts, while Mr. Rubin reports total loans of $56.7 million. ECF No. 52 at 26. We previously addressed this in our letter submitted on December 9, 2025. ECF No. 51 at 12. According to the Crown Global statements dated September 30, 2025, as provided with Mr. Rubin's affidavit, the total loans taken out against the three policies amount to approximately $56.7 million. *See* ECF No. 51-35. The apparent discrepancy is the result of a single transfer from Quantum MBS Ltd.—a Cayman Islands-based fund completely unrelated to Crown Global—in which Mr. Rubin invested during his employment with the Soros Fund. This transfer was made back in 2011 to Mr. Rubin's First Republic Bank account and does not reflect additional loan activity from the Crown Global policies. The records show no subsequent disbursements from Quantum MBS Ltd. since that time.

## X. Other Sex Trafficking Cases In Which Bail was Granted Support Mr. Rubin's Release

In *United States v. Jeffries et al.*, 24-CR-423 (E.D.N.Y. 2024), and *United States v. Fox et al.*, 22-CR-53 (W.D.N.Y. 2022), defendants facing serious sex trafficking charges—including allegations of coercion, fraud, and offenses against vulnerable individuals—were all granted pretrial release on substantial bonds (albeit far lower amounts than Mr. Rubin is proposing).[3] In *Jeffries*, Magistrate Judges Tiscione and Dunst permitted release for multiple defendants, even in the face of allegations involving the use of force, drugs, and young victims; similarly, Magistrate Judge Vilardo granted release in *Fox*, where the charges included sex trafficking by force and exploitation of drug addiction.

These outcomes are highly relevant here. The cases on which the government relies involve weapons, arson, or strong foreign ties that are not present in Mr. Rubin's case.[4] Bail being

---

[3] *See United States v. Jeffries et al*, 24-CR-423 (NJC) (E.D.N.Y. 2024) (the defendants were charged with 16 counts of sex trafficking and interstate prostitution. The indictment alleged that the defendants used force, fraud, and coercion to traffic men and operated a prostitution enterprise. The scheme allegedly involved recruiting vulnerable men, often with promises of modeling opportunities, withholding critical details about sex acts required at "Sex Events," compelling men to surrender personal items, requiring non-disclosure agreements, and, in some instances, administering erection-inducing substances or engaging in non-consensual sexual contact); *United States v. Fox et al*, 22-Cr-53 (JLS-JJM) (W.D.N.Y. 2022) (defendant allegedly coerced six individuals addicted to heroin into engaging in commercial sex acts by providing heroin and crack cocaine to keep them dependent, using physical restraints, and exploiting their withdrawal symptoms).

[4] See *United States v. Combs*, 24-Cr-542 (AS) (S.D.N.Y. 2024); *United States v. Maxwell*, 510 F. Supp. 3d 165 (S.D.N.Y. 2020).



The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
Page 9

granted in *Jeffries* and *Fox* for similar charges strongly supports the appropriateness of pretrial release for Mr. Rubin.

XI.     **Conclusion**

For the reasons set forth in our prior bail submissions and herein, we respectfully request the Court enter an order releasing Mr. Rubin from custody on the conditions we propose.

Dated: New York, New York                                 Respectfully Submitted,
December 16, 2025

DECHERT LLP
By: */s/ Benjamin E. Rosenberg*
Benjamin E. Rosenberg
Edward A. McDonald
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Tel.: (212) 698-3500
Fax: (212) 698-3599
benjamin.rosenberg@dechert.com
edward.mcdonald@dechert.com

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Michael J. Gilbert
Katherine Anne Boy Skipsey
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Tel.: (212) 653-8700
Fax: (212) 653-8701
mgilbert@sheppardmullin.com
kboySkipsey@sheppardmullin.com

cc: Counsel of Record