**Sheppard**

March 24, 2026                                                    Michael J. Gilbert
                                                                 +1.212.896.0611
                                                                 mgilbert@sheppard.com


**VIA ECF**

The Honorable James R. Cho
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re:**   ***United States v. Rubin, et al.*, CR No. 25-281 (BMC)**

Dear Judge Cho:

This letter is respectfully submitted on behalf of defendant Howard Rubin ("Rubin") in support of his application for bail. Rubin was arrested on September 26, 2025, on an indictment alleging sex trafficking in violation of 18 U.S.C. § 1591, and violations of the Mann Act, 18 U.S.C. § 2421 (interstate transportation for purposes of prostitution), and has remained detained at the Metropolitan Detention Center in Brooklyn ("MDC") since. Rubin is a 70-year-old man with no criminal history who recently suffered a stroke.[1]

Your Honor previously presided over a bail hearing for Rubin held on October 20, 2025. As Your Honor may recall, the conduct at issue—all of which involved adults who agreed to participate in BDSM[2] but claim that certain of the activity exceeded their consent—ended in 2019. Rubin has presented uncontroverted evidence that, since that time, he has been living a quiet life, dedicated to the care of his grandchildren. Indeed, the people with whom he has spent the most time since 2019 (his wife who has filed for divorce, his daughter and his brother) are all supporting him in this bail application. He was aware of a federal criminal investigation for years and did not flee.

There is an extensive record related to Rubin's prior bail applications, as discussed below and in the supporting materials submitted herewith, including complete financial disclosures for

---

[1] On March 20, 2026, MDC staff checked Rubin's blood pressure and recorded a reading of 155/80, a level commonly classified in the danger zone of hypertension and indicative of an elevated health risk. Notably, over the past three months, his blood pressure has been checked only twice in custody, and both readings have been significantly high, underscoring an ongoing medical concern that is not being regularly monitored in detention.

[2] "BDSM" refers to bondage, discipline, dominance, submission and sadomasochism.

Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112
T: +1.212.653.8700 | F: +1.212.653.8701
sheppard.com

The Honorable James R. Cho
March 24, 2026
Page 2

Rubin and his proposed co-signers. For the Court's convenience, attached to this letter is an index to the supporting materials, including the transcripts of the prior bail hearings.

Rubin has revised his bail package to address each and every concern raised by the government and the Court in connection with his prior applications. The bail package he now proposes, described below, provides more than reasonable assurance that he will appear in court and does not (and cannot) pose any danger to the community. The prior bail applications have not been denied based on danger to the community. The government has also raised allegations of "witness tampering," which Rubin adamantly denies. Importantly, none of those allegations involve any conduct since 2019 either. In fact, during related civil litigation that was pending in this court for eight years, including a jury trial in 2022 before United States District Judge Cogan (to whom this criminal case is assigned), there were no allegations that Rubin took any steps to interfere with the process in any way and all of the plaintiffs testified.

As described below and in supporting affidavits, the vast majority of the Rubin family's net worth is held within life insurance policies issued by a company called Crown Global Insurance Group, LLC ("Crown Global"). The proposed package will ensure that Rubin will have no access to Crown Global assets and that they are available to the government in the unlikely event it is necessary to enforce the bond. This proposal to restructure the ownership of these policies is an updated, new feature of the bail package. In addition, the amount of the proposed bond has been increased from the already extraordinary $70 million to $75 million with half of that value deposited with the Clerk of the Court in cash and pledged real estate.

## I. Rubin is Not a Danger to the Community

Although the government has cast its allegations in sensationalized "sex trafficking" terms—amplified by extensive media coverage—the charges arise from Rubin's interactions with *adult* women who agreed to engage in private BDSM sexual activity in exchange for money, but who now allege that, in *certain* encounters, Rubin exceeded the scope of their consent. This alleged conduct did not affect the community at large. Moreover, the government has acknowledged on the record that there is *no* allegation that Rubin has engaged in these activities since 2019. October 20, 2025 Bail Hearing, Tr. 25:14-15 (attached as Exhibit A) ("Your Honor, the defendant -- the last sex crime was charged in 2019").

During prior bail hearings, both Magistrate Judge Kuo and Your Honor[3] expressly stated that concerns regarding Rubin's dangerousness were not the basis for their denial of bail. During the October 20, 2025 bail application hearing, Your Honor asked the government:

---

[3] Rubin first sought release on bail on the day he was arrested, September 26, 2025, before Magistrate Judge Kuo. Dkt. 10. He then revised his bail package and sought bail on October 20, 2025, before Your Honor, who, in denying the application, cited the need for additional financial information from Rubin and the proposed co-signers. Exhibit A, Tr. 33-34. Following the October 20, 2025 hearing, Rubin submitted full financial statements for himself, his wife and his daughter and other comprehensive financial information, as well as an increased bail package to Magistrate Judge Kuo. *See* December 9, 2025 Letter in Support of Bail (attached as Exhibit C).

The Honorable James R. Cho
March 24, 2026
Page 3

- "[A]re you aware of any allegations of [witness] intimidation after 2019?"  Exhibit A, Tr. 25:8-9.  To which the government responded "[n]o, Your Honor."  *Id*. at 25:10.

  Your Honor then asked:

- "[A]re you aware of any other allegations regarding sex trafficking post 2022?"  Exhibit A, Tr. 25:11-13.  The government's response was "the last sex crime was charged in 2019."  *Id*. at 25:14-15.

  In the December 17, 2025 hearing, Magistrate Judge Kuo stated:

- "I'm not going to focus on the dangerousness part because to me, the important part is the risk of flight . . . To be quite frank, [I am] less concerned that during the pretrial release [he] will engage in the criminal activities of which he is charged here.  I'm less concerned about that."  December 17, 2025 Bail Hearing, Tr. 51:5-11 (attached as Exhibit B).

## II.    Rubin is Not a Flight Risk

In denying bail, Magistrate Judge Kuo and Your Honor focused primarily on the amount of the proposed bond relative to Rubin's and his family's substantial financial resources, as well as concerns regarding financial transparency.  Exhibits A & B.  However, Rubin has provided detailed financial affidavits listing his entire family's assets and the proposed conditions—in which he would relinquish control of his assets entirely—would make it impossible for him to access his wealth to flee.  Other than speculation, the government has offered no evidence to the contrary.

Further, as noted above, Rubin is 70 years old and recently suffered a stroke.[4]  He has no criminal history.  Since 2020, he has been devoted to caregiving for his grandchildren.  He was arrested at his home in Connecticut, where he moved to be close to them.

Rubin was sued in a civil case filed against him in 2017 which related to much of the alleged conduct in this case.  *Lawson, et al. v. Rubin, et al.*, No. 17-cv-6404 (E.D.N.Y. Nov. 2,

---

[4] Several courts have recognized that the conditions at the MDC are not fit for pretrial detention, let alone to treat a serious health condition.  *See* October 16, 2025 Letter in Support of Bail, at 6 (attached as Exhibit D).  It is indisputable that a stroke is a serious medical issue, that strokes are recurrent, and that they should be treated by a specialized healthcare provider on an ongoing basis.  *See* Jona T. Stahmeyer et al., The Frequency and Timing of Recurrent Stroke: An Analysis of Routine Health Insurance Data, 116 *DTSCH. ÄRZTEBL. INT'L* 711–17 (2019) (attached as Exhibit E).  Rubin is already experiencing the MDC's shortcomings with respect to his medical care.  For example, Rubin repeatedly requested medication and a sick call beginning on December 17, 2025, yet he did not receive the prescription or see a doctor until February 24, 2026.  He is also supposed to have his blood pressure checked regularly but—after almost six months—that has not happened.  We have had to intervene and write to the MDC Legal Department several times about these issues.

The Honorable James R. Cho
March 24, 2026
Page 4

2017) (the "Civil Case").  As noted, that case was tried in this Court in 2022 before Judge Cogan.

Rubin was also keenly aware of the criminal investigation and potential indictment.  His counsel was in direct contact with the U.S. Attorney's Office about it at least a year before he was arrested.  Despite knowing all of this, Rubin did not flee.

Rubin has not traveled outside the United States in approximately seven years, and has no ties to any other country, no property in any other country, and no family in any other country.  There is simply no evidence from which to conclude that he would flee, especially knowing he would never again see his grandchildren.  The numerous letters[5] submitted in support of his bail application make clear that Rubin would never risk forfeiting the opportunity to see his children and grandchildren again.

### III.    Revised Bail Package[6]

Although Rubin poses neither a danger to the community nor a flight risk, he proposes the following exceedingly stringent conditions, which more than reasonably assure his return to court:

1.  A $75 million personal recognizance bond, co-signed by Rubin, his wife, Mary Henry[7], and his daughter, Annalee Rubin;

2.  The bond will be secured by the following funds and unencumbered properties which combined represent approximately $37.6 million in value: (i) $10 million in cash to be deposited with the Clerk of the Court by Ms. Henry; (ii) $25 million in cash to be deposited with the Clerk of the Court by Rubin; (iii) a home Ms. Henry owns in Connecticut with approximately $1.6 million in equity; and (iv) a residence in Connecticut owned by Rubin's brother, Jonathan Rubin, where he and his family reside full time, with approximately $1 million in equity;

3.  Rubin will transfer ownership in his Crown Global Life Insurance Policies[8] to a United States–based LLC set up specifically for this purpose, and will assign a security interest in the LLC to the government; Rubin will not have control over the LLC, it will be controlled by an independent trustee; Ms. Henry will transfer

---

[5] Letters of Support from Rubin's family and friends are attached as Exhibits F-N

[6] Other than the first, third, and fourth conditions—which have been strengthened—the proposed conditions remain unchanged from the prior bail package submitted to Magistrate Judge Kuo.  Exhibit C.

[7] Rubin and Ms. Henry are in the process of filing for divorce.  Despite this, as made clear by her willingness to support this bail package and the letter of support she has submitted, Ms. Henry steadfastly insists that Rubin will not flee.

[8] As detailed in the December 9, 2025 Bail Letter (Exhibit C), and explained further below, Rubin, Ms. Henry, and the Henry Family Trust hold substantial life insurance policies with Crown Global.

The Honorable James R. Cho
March 24, 2026
Page 5

ownership of her Crown Global Insurance policy to a U.S.–based LLC, and a separate policy owned by a Henry family trust will also be transferred to a U.S.–based LLC over which Rubin will have no control and will also be controlled by an independent trustee.

4.  Rubin will transfer control of each of his accounts to an independent trustee, who will be permitted to take money out of the accounts or to borrow against the insurance policy only for specified purposes, principally family expenses and medical and legal fees;

5.  Electronically monitored home detention with a 24/7 armed security guard;

6.  Installation of security cameras to provide 24/7 monitoring of Rubin's residence, with real-life monitoring available for Pretrial services, as well as video recording;

7.  Surrender of passport;

8.  No contact with co-defendants (other than in the presence of counsel) or any known witnesses, Jane Does, or victims; and

9.  All other standard conditions of pretrial supervision.[9]

**IV.  The Concerns Raised in the Prior Bail Hearings—Substantiality, Transparency, and Access to Assets—Are Fully Addressed by the Proposed Bail Package**

A.  The Substantialness of the Proposed Package

A $75 million bond significantly exceeds Rubin's net worth, which is approximately $44 million,[10] and represents nearly 50% of his family's total net worth.  Exhibit C.  It also accounts for nearly 80% of his wife's net worth.  *See* Mary J. Henry Affidavit (attached as Exhibit O).

---

[9] The proposed bail package is undeniably substantial, however, if the Court has any further concerns about risk of flight, Rubin is prepared to adopt the following bail conditions, outlined in *United States v. Sabhnani*, 493 F.3d 63, 79 (2d Cir. 2007):  (i) a Court-appointed, independent accountant to review Rubin's assets and provide the Court with an accurate summary of the status of each; (ii) all accounts reviewed and summarized by the independent accountant to be restrained by properly filed orders which will permit transfers only for authorized purposes; (iii) the conditions of home detention to be monitored by a private investigator firm; (iv) Rubin to maintain one hard line telephone and one hard line fax, to be electronically monitored by the private investigator; and (v) the private investigator to monitor and record all of Rubin's computer activity from a single desktop computer located in the residence with a single internet connection.

[10] The government has claimed that Rubin "lied" about his net worth on the day of his arrest when he told Pretrial Services that he estimated it to be $35 million.  In connection with his bail applications, counsel has conducted a comprehensive review of his finances and confirmed that his net worth is approximately $44 million.  His previous estimate—provided in the stressful circumstances of being arrested by multiple armed agents—was reasonable.  There was no intent to mislead the Court, and his remarkable

The Honorable James R. Cho
March 24, 2026
Page 6

### B.  The Proposed Condition of 24/7 Private Security

The government opposes the condition of 24/7 private security that the Second Circuit has expressly endorsed when the flight risk arises "primarily because of [a defendant's] wealth." *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019) (reaffirming the private-security condition described in *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007)).  At prior hearings, both the government and Magistrate Judge Kuo and Your Honor have relied almost exclusively on Rubin's significant wealth to justify detention.

That is precisely when private security is appropriate: it is a proven, less-restrictive alternative to detention, and it addresses the government's stated concern head-on.  To bar that option merely because some defendants of lesser means could not afford it defies the government's own logic—penalizing Rubin for the very resources the government cites as the source of risk.  It would also raise fundamental equal-protection concerns, because it would convert wealth from a risk factor for flight into the reason to deny the remedy that mitigates that risk, resulting in a form of wealth–based discrimination with no basis in any legitimate governmental objective.  In fact, Rubin would effectively be funding his own detention, reducing the financial burden to an already strained system.  District courts have implemented exactly this condition before where the defendant's wealth dominated the flight-risk analysis.  *See United States v. Weigand*, 492 F. Supp. 3d 317, 319 (S.D.N.Y. 2020); *United States v. Akhavan*, No. 20-cr-188-2 (JSR), 2021 U.S. Dist. LEXIS 27458, at *10-11 (S.D.N.Y. Feb. 12, 2021).  Denying Rubin this proven, less-restrictive alternative would therefore contravene both the Bail Reform Act and the Constitution.

Even applying the *Boustani* standard at its most stringent, the condition of private security should be permissible here.  Rubin would have been released on bail but for his wealth.  Without Rubin's substantial wealth as a basis for the government's opposition to bail, it is difficult to conceive of any plausible argument for detention.

Nor has the government identified any legitimate non-wealth-based reason to detain Rubin.  We have refuted each and every attempt by the government to portray Rubin as a danger to the community: the alleged conduct occurred more than six years ago, and there is uncontroverted evidence that Rubin has been living a quiet life since any of the alleged conduct.  There are also no independent reasons to find Rubin a flight risk.  He has no ties to any foreign country and he would surrender his passport, effectively removing any ability to flee.  Indeed, in prior bail hearings, Magistrate Judge Kuo and Your Honor focused almost exclusively on Rubin's wealth as the driver of any flight-risk determination—underscoring that this is exactly the kind of case where private security is not only permissible, but necessary to avoid a wealth-based detention regime that does not comport with equal protection.

To deny Rubin the right not to be detained—despite his compliance with all statutory and constitutional requirements—would violate his constitutional rights.  He cannot be denied the

---

transparency regarding his and his family's financial situation since he was arrested further demonstrates his good faith.

The Honorable James R. Cho
March 24, 2026
Page 7

statutory and constitutional right to secure his compliance using his own resources simply because other, less wealthy defendants cannot afford the private security permitted by the statute. Cash bail is likewise unaffordable for some, but that reality cannot be used to deny others who can afford it the right to remain free on cash bail. The Equal Protection Clause does not require that the wealthy be denied the right to satisfy the statutory criteria for pretrial release merely because not every defendant can afford to do so. Indeed, discriminating against those who can meet the constitutional criteria using their own funds would itself violate the Equal Protection Clause.

### C.  Enforceability of the Bond Against Crown Global Policy Assets

To further assuage the Magistrate Judges' concerns regarding the government's ability to collect on the bond in the unlikely event that should ever become necessary, we have also proposed mechanisms to make Rubin's and his family's assets more readily accessible to the government in the event of a default.

As an initial matter, we underscore that the proposal includes cash and property that total over half of the amount of the bond, $37.6 million. That value can be seized by the government immediately upon default. To collect the balance of the bond, Rubin and Ms. Henry hold assets directly in U.S.–based accounts, and real estate totaling approximately $40,528,425. Exhibit C, at 5. The financial affidavits of Rubin (attached as Exhibit P) and Ms. Henry (Exhibit O) that were submitted with the prior bail application each provide detailed statements of personal net worth.

There was a focus at each of the previous bail hearings about substantial life insurance policies that Rubin, Ms. Henry, and the Henry Family Trust hold with Crown Global.[11] Exhibits A & B. Crown Global is based in Bermuda and the life insurance policies are managed by a Crown Global affiliate in the Cayman Islands. The government has expressed concern that (i) were Rubin to flee, the government could not seize the assets in his Crown Global policies, and (ii) the existence of the policies means that Rubin either has access to funds abroad, or could move funds abroad. The current bail package addresses all these concerns.

First, the Crown Global funds are reachable. While Crown Global is based abroad, as we have demonstrated, the investments held within those policies are situated in the United States and thus are seizable by the government. Exhibit B, Tr. 37:25-38:9 (Government), 20:21-24 (Court); 22:4-23:19 (Defense Counsel). In any event, to address the government's concern, we have significantly increased the cash component of the security. The financial affidavits we have submitted (Exhibits O & P) make clear that, even putting aside the Crown Global life insurance policies, Rubin and Ms. Henry hold assets directly in U.S.–based accounts, and real estate totaling approximately $40,528,425. Exhibit C. Between the posted security and those available assets directly held in U.S.–based accounts and real estate, the government would immediately

---

[11] The policies were not obtained to enhance Rubin's ability to flee, as they were purchased in or about 2000. Rubin, Ms. Henry, and the Henry Family Trust have thus held the policies in Crown Global for approximately 25 years.

The Honorable James R. Cho
March 24, 2026
Page 8

be able to secure the full amount of the bond.  The government would never need to seize the money in the Crown Global policies to collect the full amount of the bond.

Further, Rubin and Ms. Henry have agreed to transfer ownership in the insurance policies to a U.S.–based LLC, set up specifically for this purpose, and will assign a security interest in the LLC to the government.  This structure will enable the government to seize the monies in the policies in the unlikely scenario Rubin flees.

While we anticipate the government will argue that Ms. Henry would still have access to significant assets, it is incredulous to think that she would risk losing funds that would otherwise ultimately be inherited by her children and grandchildren.  Her participation and support for this bail package, despite their pending divorce, is incontrovertible evidence of her certainty that he would not flee.

## V.    The Government's Remaining Objections Provide No Basis for Detention

### A.  Rubin's Passport

The government has claimed that, on the day he was arrested at his home in Connecticut, Rubin refused to tell the agents where his passport was located to deceive them.  *See* government's December 10, 2025 Letter Opposing Bail (attached as Exhibit Q).  That is not the case.  When agents asked Rubin where his passport was located, he initially refused to answer and then stated that he wanted to speak with his attorney.[12]  Furthermore, the agents questioned him about his passport without reading him his rights first.  He had no obligation to answer any of their questions and he did not recall where his passport was as he had not used it for almost six years.  In fact, his passport was not at his house or even in the same state—it was at his wife's apartment in Manhattan.  None of this is any evidence of risk of flight.

### B.  Rubin's Phones

The government initially claimed that it seized seven cell phones from Rubin's home on the day he was arrested.  Exhibit Q, at 11.  The government has since acknowledged that most were old devices, including an iPod.  Exhibit B, Tr. 27:16-25.  As to the two new cell phones, they are not evidence of risk of flight.  They were completely unopened, turned off, and not connected to a carrier.  As mentioned, Rubin was aware of the serious nature of the federal investigation for over a year.  In November 2024, he consulted with a Connecticut lawyer to prepare for a possible arrest at home, away from his New York based lawyers, and this lawyer told him that if he was going to be arrested he would likely be released on bail, but that they would take his phone.  He purchased the iPhones anticipating his phone might be seized.  While it may seem frivolous to purchase new phones despite already having a relatively new iPhone, Rubin is wealthy and purchasing new phones at cost is not uncommon or suspicious.  Despite ample opportunity to flee, Rubin did not attempt to evade authorities.  Critically, if Rubin had intended to flee, he would have needed his passport—an item far more essential than unopened,

---

[12] The FBI report of Rubin's arrest was produced by the government at Bates number EDNY_RUBIN_00000003.

turned off, and unconnected cell phones. But his passport was in another state. He had ample time to flee if that is what he intended to do. He did not.

### C.    Alleged Witness Tampering

The government alleges that Rubin engaged in "witness tampering" on several occasions in connection with the Civil Case. Exhibit Q. Those claims lack merit. *See* December 16, 2025 Letter in Further Support of Bail, at 4–5 (attached as Exhibit S). As noted, the government acknowledges that there are no allegations of what it characterizes as "witness tampering" since 2019. Exhibit A, Tr. 24:16-19. Indeed, throughout the pendency of the civil action for approximately eight years, including trial, there were no allegations that Rubin took any steps to intimidate or otherwise prevent any plaintiff from testifying. Had that occurred, Judge Cogan— who presided over the civil case—would have addressed it. There was no need for him to do so.

### D.    Concerns About Rubin's "Double Life"

The government has raised that Rubin led "a double life and he has asked members of his family to come in as cosigners on this bond when in fact they may not have been aware of his activity in the past before the lawsuit, civil lawsuit, had been filed." Exhibit A, Tr. 33:10-16.

The government appears to be arguing that Rubin's alleged activities show that he is callous and that he would therefore be willing to leave his family in the lurch. But that argument flies in the face of the overwhelming evidence—from Ms. Henry, his daughter, his niece, two brothers, and friends and neighbors, Exhibits F-N—that he is a loving father and grandfather and intimately tied to his family. The government has no answer to that substantial showing. Even more, the government's concern that the family members were not aware of Rubin's activities "before . . . the civil lawsuit, had been filed" (Exhibit A, Tr. 33:10-16) is irrelevant. The family members are aware of the allegations about Rubin's behavior *now* (and they have been for more than eight years), and they are indisputably committed, at their own risk, to standing behind him.

### VI.    The Proposed Package Is More Than Sufficient Considering Comparable Cases

The proposed bail package is comparable to or exceeds the bail packages that other courts have accepted for defendants similar to Rubin. *See, e.g.*, *United States v. Jeffries*, No. 24-CR-423 (NJC) (E.D.N.Y. Oct. 25, 2024) (the defendant was charged with sex trafficking and interstate prostitution and released on a $10 million bond); *United States v. Fox*, No. 22-CR-53 (W.D.N.Y. 2022) (the defendant was charged with sex trafficking and released on a $300,000 bond); *United States v. Gardner*, 523 F. Supp. 2d 1025 (N.D. Cal. 2007) (the defendant was charged with conspiracy to engage in sex trafficking of minor and sex trafficking of minor and released on a $75,000 bond).

### VII.    Conclusion

Rubin's continued detention is unwarranted and contrary to the standards set forth in the Bail Reform Act. The record establishes that Rubin is neither a danger to the community nor a flight risk. The Court's prior concerns regarding financial sufficiency and transparency have now been fully addressed through comprehensive disclosures, a substantial bond secured by

The Honorable James R. Cho
March 24, 2026
Page 10

significant cash and real property, and stringent conditions that foreclose meaningful access to assets and eliminate any realistic risk of flight.  Rubin therefore respectfully requests that the Court order his release on the proposed conditions.


Respectfully Submitted,



SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Michael J. Gilbert
Katherine Anne Boy Skipsey
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Tel.: (212) 653-8700
Fax: (212) 653-8701
mgilbert@sheppard.com
kboyskipsey@sheppard.com

CLAYMAN, ROSENBERG, KIRSHNER &
LINDER LLP
Isabelle A. Kirshner
305 Madison Ave., Ste. 650
New York, NY 10165
Tel.: (212) 922-1080
Fax: (212) 949-8255
kirshner@clayro.com

AGNIFILO INTRATER LLP
Marc Agnifilo
140 Broadway, Ste. 2450
New York, NY 10005
Tel.: (646) 205-4352
marc@agilawgroup.com


cc:      All Counsel of Record

Attached (Index of Supporting Materials)

The Honorable James R. Cho
March 24, 2026
Page 11

## INDEX OF SUPPORTING MATERIALS

I.   **December 17, 2025 Bail Hearing Materials**

- Exhibit B: Transcript of December 17, 2025 Bail Hearing before Magistrate Judge Kuo

- Exhibit C: December 9, 2025 Letter in Support of Bail

- Exhibit Q: December 10, 2025 Letter Opposing Bail

- Exhibit S: December 16, 2025 Letter in Further Support of Bail

II.   **October 20, 2025 Bail Hearing Materials**

- Exhibit A: Transcript of October 20, 2025 Bail hearing before Magistrate Judge James R. Cho

- Exhibit D: October 16, 2025 Letter in Support of Bail

- *Dkt. 42*: October 19, 2025 Government Letter Opposing Bail

III.   **September 26, 2025 Presentment**

- *Dkt. 6*: September 26, 2025 Government Letter Regarding Detention and Bail Conditions

- *Dkt. 9*: Transcript of September 26, 2025 Initial Presentment and Bail Hearing before Magistrate Judge Peggy Kuo

IV.   **Letters of Support**

- Exhibit F: Mary J. Henry Letter of Support

- Exhibit G: Annalee Rubin Letter of Support

- Exhibit H: Miss Donna Letter of Support

- Exhibit I: Diana Shyket Letter of Support

- Exhibit J: Jonathan Rubin Letter of Support

- Exhibit K: Kenneth Rubin Letter of Support

- Exhibit L: Denise Fernandez Letter of Support

The Honorable James R. Cho
March 24, 2026
Page 12

- <u>Exhibit M</u>: Eli Driscoll Letter of Support

- <u>Exhibit N</u>: Richard Correll Letter of Support

**V.    Financial Affidavits**

- <u>Exhibit O</u>: Mary J. Henry Financial Affidavit

- <u>Exhibit P</u>: Howard Rubin Financial Affidavit

**VI.    Additional Materials**

- <u>Exhibit E</u>: Jona T. Stahmeyer et al., The Frequency and Timing of Recurrent Stroke: An Analysis of Routine Health Insurance Data

- <u>Exhibit R</u>: Intentionally Left Blank (EDNY_RUBIN_00000003)