

April 10, 2026

Michael J. Gilbert
+1.212.896.0611
mgilbert@sheppard.com

**VIA ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza
Brooklyn, NY 11201

**Re:** *United States v. Rubin, et al.*, **CR No. 25-281 (BMC)**

Dear Judge Cogan:

On behalf of Howard Rubin, we respectfully notify the Court that, pursuant to 18 U.S.C. § 3145(b), Mr. Rubin appeals the March 27, 2026 Order of continued detention entered by Magistrate Judge James R. Cho. The transcript of the March 27, 2026 hearing is attached as Exhibit A. Counsel has conferred with Chambers and understands that the Court has scheduled a hearing on the appeal for April 29, 2026. Counsel and the Government have jointly agreed that Mr. Rubin will file any papers in support of the appeal by April 15, 2026, and the Government will file its opposition papers by April 22, 2026.

Respectfully Submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Michael J. Gilbert
Katherine Anne Boy Skipsey
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Tel.: (212) 653-8700
Fax: (212) 653-8701
mgilbert@sheppard.com
kboyskipsey@sheppard.com

Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112
T: +1.212.653.8700 | F: +1.212.653.8701
sheppard.com

AGNIFILO INTRATER LLP
Marc Agnifilo
Zach Intrater
Teny Geragos
140 Broadway, Ste. 2450
New York, NY 10005
Tel.: (646) 205-4352
marc@agilawgroup.com
zach@agilawgroup.com
teny@agilawgroup.com


cc: All Counsel of Record

Attached: Exhibit A

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,　　 : 25-cr-00281-BMC
　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　 :
　　- versus -　　　　　　　　 : U.S. Courthouse
　　　　　　　　　　　　　　　 : Brooklyn, New York
HOWARD RUBIN,　　　　　　　　 :
　　　　　　　　　　　　　　　 : March 27, 2026
　　　　　　　　 Defendant　　 : 12:17 p.m.
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
BEFORE THE HONORABLE JAMES R. CHO
UNITED STATES MAGISTRATE JUDGE

**A　P　P　E　A　R　A　N　C　E　S:**


**For the Government**:　　　　 **Joseph Nocella, Esq.**
　　　　　　　　　　　　　　　 Interim United States Attorney

　　　　　　　　　　 BY:　 **Tara B. McGrath, Esq.**
　　　　　　　　　　　　 **Kayla C. Bensing, Esq.**
　　　　　　　　　　　　 **Nina C. Gupta, Esq.**
　　　　　　　　　　　　 Assistant U.S. Attorneys
　　　　　　　　　　　　 271 Cadman Plaza East
　　　　　　　　　　　　 Brooklyn, New York 11201



**For the Defendant**:　　　　 **Michael J. Gilbert, Esq.**
　　　　　　　　　　　　　　　 **Katherine Skipsey, Esq.**
　　　　　　　　　　　　　　　 Sheppard Mullin Richter &
　　　　　　　　　　　　　　　　 Hampton LLP
　　　　　　　　　　　　　　　 30 Rockefeller Plaza
　　　　　　　　　　　　　　　 New York, NY 10112


　　　　　　 (Appearances continue on next page)



**Transcription Service**:　　 **Transcriptions Plus II, Inc.**
　　　　　　　　　　　　　　　 61 Beatrice Avenue
　　　　　　　　　　　　　　　 West Islip, New York 11795
　　　　　　　　　　　　　　　 RL.Transcriptions2@gmail.com



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

APPEARANCES CONTINUED


**For the Defendant**:        **Isabelle A. Kirshner, Esq.**
Clayman Rosenberg Kirshner
 & Linder LLP
60 East 42nd Street, Ste. 3900
New York, NY 10165


**Mark A. Agnifilo, Esq.**
Agnifilo Intrater LLP
445 Park Avenue, 7th Floor
New York, NY 10022

Proceedings

THE CLERK: We have a Criminal Cause for a Bail Application, 25-cr-281, *United States v. Howard Rubin*.

Counsel, starting with the government, please state your appearances for the record.

MS. MCGRATH: Good afternoon, your Honor. Tara McGrath, Kayla Bensing, and Nina Gupta for the government.

MR. GILBERT: Good afternoon, your Honor. Michael Gilbert, Katherine Anne Boy Skipsey, Isabelle Kirshner, and Mark Agnifilo on behalf of Mr. Rubin who's seated next to me.

THE COURT: All right. Good afternoon, everyone. Mr. Rubin, how are you doing?

THE DEFENDANT: Okay.

THE COURT: All right. We're here for a new application for bail. Mr. Gilbert, do you want to be heard? I have reviewed all the submissions but do you want to be heard?

MR. GILBERT: I would. Thank you very much, your Honor.

THE COURT: All right. Go ahead.

MR. GILBERT: So as your Honor may recall, we were here last in front of you in October. It was about a month after Mr. Rubin was arrested and we made a bail application at that time.

Proceedings

Since that time, Judge, we've undertaken extensive benefits to address the concerns that you pointed us to in denying that bail application. And primarily what we focused on, the two issues that you identified related to financials, whether the package we proposed was substantial in light of Rubin's assets and whether there was sufficient transparency with regard to his financial condition.

So we took that very much to heart. We have provided at this time I submit total transparency, complete financial affidavits for Rubin and his cosigners, a comprehensive review of all of his accounts and financial records, and we had proposed a bail package today which I think is undoubtedly substantial in light of the financial condition of Mr. Rubin and his family.

He's someone with zero criminal history. He's 70 years old. He suffered a stroke recently. He has absolutely no ties to any other country and irrefutably deep meaningful ties to this country. He had every opportunity to flee because he knew he was under investigation and he didn't do so. And the government has acknowledged on the record in response to questions from your Honor that there is no evidence of any sex crimes after 2019.

In light of all that, the package we propose is

Proceedings

exceedingly substantial.  It's a $75 million secured bond to be cosigned by Mr. Rubin, his wife Mary Henry, and his daughter Anna Lee Rubin, who are here today.  When we were here before in the last, the proposal was a $50 million bond.  It's now 75 million.

The bond is going to be secured by substantial cash to be deposited with the clerk of the court.  It's a total value of $37.6 million.  It will be 35 million of that in cash deposited with the clerk of the court, and then two properties with equity totaling $2.6 million will be secured and offered as security for the bond.

When we were here before you last on that score, Judge, we were offering a $6 million cash bond.  So obviously it's tremendously more, significant security.

Mr. Rubin will transfer control of each and every account of his to an independent trustee.  He will be permitted to take money out only under specific circumstances for any approved family expenses, medical, and legal fees.  He will have electronically monitored home detention with a 24/7 armed security guard.  There will be installation of security cameras at his home, which will be made available, the feed can go straight to Pretrial Services.  It will all be recorded.  He will surrender his passport.  He will have an order saying

there's no contact with any co-defendants or any other witnesses. And he'll have all the other standard conditions.

We also have proposed some specific provisions that are related to, as your Honor may recall the discussion we had here about the Crown Global life insurance policies, and we have again tried to address all the concerns raised by the government on that front. And I'll talk about how we propose to do it.

But what we're seeking to accomplish is to have those transferred to, ownership of those policies, to United States based LLCs with security interest in favor of the government so there can be no problem or no issue in the unlikely event that they ever have to access those policies to secure the bond. And they wouldn't need to do that because half the bond value will be sitting here in the court. Then we have to properties. And then there are other assets that are not in the insurance policies that will be available to them.

So I don't want to belabor it. I know your Honor is well familiar with the legal standards. But frankly, in light of the very lengthy submission by the government last night, or yesterday, I think it's important to just bring back everyone's attention to what the issues are for today which is risk of flight and

danger to the community.

And the Bail Reform Act, even in a presumption case like this, is clear that it's the government that bears the burden of persuasion on risk of flight and danger to the community. And they have to show that even with these conditions, even with the 24/7 security guards, even with relinquished control of all of his assets that all those conditions, that's not sufficient to ensure that he won't flee. They have the burden of persuasion on that point. And I respectfully submit that they do not even approach meeting that burden.

3142(c)(1)(B) says that the Court should impose the least restrictive combination of conditions that will reasonably ensure the appearance of the defendant. I respectfully submit that the conditions that we are proposing are well beyond that standard. They provide full assurance that if released on these conditions he poses no risk of flight and no danger to the community.

Again, the government acknowledges no allegations of any of the activity that's at the heart of this case after 2019. We have submitted detailed letters from family, friends, and neighbors which all show that since 2019 what he's been doing is living a quiet life in Connecticut focused on his grandchildren. There is really nothing in the government's submission that

Proceedings

contradicts that.

The people that he has spent the most time with in recent years, his wife who's here, his brother who's here, his daughter Anna Lee who's here, all support this bail application. And there's un-controverted documentary evidence that shows his deep ties to the community and to his family. And again, zero evidence that he has ties to any other community.

Now, I know the Court is familiar with the case and I just would like to quickly summarize it because the charges relate to obviously the TVPA, the sex trafficking and the Mann Act charges.

But again, I think it's important to try to underscore the context in which these charges arise because frankly, it's really quite different than some of the highly publicized sex trafficking cases that we see. It all takes place in, for lack of a better word, the phrase that captures it for me, it's a subculture of BDSM. And it all involves adults. And all of these adults, even Judge Kogan who presided over the civil trial that we've talked about before and that we mentioned in our submissions that occurred in this courthouse in 2022 involving very much the same conduct and in some cases the same individuals, Judge Kogan's description of it was notwithstanding, and this is from

Proceedings

his decision on a post trial motion, notwithstanding having voluntarily traveled to New York City from out of state and agreeing to engage in sadomasochism with Rubin, plaintiffs believed he went too far in certain of those encounters. So again, it's adult activity. It's knowing consent. It's consent to BDSM.

Now, there are allegations and certainly that's the basis of the indictment that at certain points it went too far and I don't in any way mean to belittle that. Those are serious allegations no doubt. But it's a very different scenario than again some of the other sex crime cases that we're talking about.

And frankly, the result of the civil case, and as the government points out and is undoubtedly the case, there was a finding of liability. But I think in fairness, and I don't -- there's no way for anybody to really know what a jury was thinking and I don't pretend otherwise, but the fact is the total damages awarded in the civil case, which was about $3.8 million and included punitive damages of $150,000 after the jury heard evidence of Mr. Rubin's wealth, I think a fair read of it is that it really was not -- they factored in that there were some very difficult issues to grapple with in that case.

There was extensive text messaging before these

activities where Mr. Rubin was very up front about exactly what was going to take place. There's extensive text messaging after, and many of the plaintiffs in the civil case came back for additional encounters after some of the events that they complained about that formed the basis of the civil case.

Mr. Rubin testified in that case, Judge. He has maintained, he took the stand, that he always wanted and believed that the BDSM was consensual. And as we set forth in our submissions, I think there's a lots of evidence to support it.

I don't mean to argue the merits of the case. That's not what we're here to do today. The point of this is simply that I think the government's submission suggests that it's a foregone conclusion that he's going to be convicted of these crimes and we respectfully disagree with that.

Jane Doe number one in their indictment testified in the civil trial and she was asked you had a consensual BDSM relationship with Howard Rubin for years, correct? Answer, yes, that is correct. You made your own travel arrangements to do that, correct? Yes, I did. You booked your own flights? Yes, I did. Nobody ever forced you to get on a plane to come to New York to meet with Rubin? That is correct.

She was then asked -- there were numerous text messages, graphic messages that she has sent to him after the last time they were together in which she's clearly seeking to have another encounter with him. And she's asked you would agree that the clear purpose of these communications is for you to get Mr. Rubin to agree to see you for another BDSM encounter, correct? Answer, yes.

So again, that's the nature of some of the evidence in this case that I think the Court should factor into the bail decision because it goes to the strength of the evidence and it goes to whether Mr. Rubin has, as the government suggests, no intent to do anything other than flee. It's just not the case.

The financial information that we submitted, again, the $75 million bond, it exceeds his entire net worth, Judge. We submitted detailed affidavits. The government doesn't dispute anything in those affidavits. In fact, they quote from them in their own submission and we count them. They've had access to his financial records for many many years.

His counsel did an extensive review after we were here last and we see nothing in those records to suggest that any money ever went to some undisclosed overseas account, that it was anything that was done in

Proceedings

preparation of fleeing or that would support fleeing.  We spent over 150 hours on the review itself.  And the government has had that information, it had our summary.  They have not come back and pointed to anything about it that they say is incorrect.

In any event, what we're prepared to do by any means necessary through our proposal for an independent trustee or if the Court thinks a court appointed trustee is to have Mr. Rubin relinquish his ability to access any of these accounts.

Now, this is not a financial fraud case.  This is his money.  So I think frankly the proposal is over the top in that regard.  But we're trying to just meet every single concern the government has.  He won't be able to access any of the money.

Now, let me just try to summarize briefly the Crown Global life insurance accounts because there's been a fair amount of focus on them.  I mean just to step back, we're talking about accounts that were set up two decades ago.  They did not -- he couldn't even conceivably have done it to support fleeing or anything to do with this case.

The only connection to any other country that is in the record here is that it happens to be that the life insurance company is domiciled in the Bahamas and

uses an administrator in the Cayman Islands.  That's it. The funds themselves are actually invested in the United States.  They're in accounts here in the United States.

But nonetheless, the government has repeatedly pointed to this as suggesting that there's something nefarious about it or something that's overseas that makes it difficult for them.

And so we've done everything we could possibly do.  We thought of every possibility to allay those concerns.  And we think the most practical way to do it is what we suggested and what we're prepared to do is have the ownership of those accounts turned over to the U.S. based LLCs that will be formed for that very purpose.  We've checked with the insurance company.  They are acceptable to that.  They will be given a security interest so that in the event they flee, they have a lien on that and they can take over that LLC, they own the policies.  It won't be necessary for that to be done for multiple reasons.

But again, as I said before, they can get the value of the bond almost instantaneously, half of it, just from what's sitting here.  And then there are other accounts that we've given them, we've shown them exactly what's in them.  They're in the affidavits.  And they can seize funds from there.

Proceedings

With regard to ensuring in general lack of ability to flee, I think we have submitted a proposal that makes it impossible for him to flee even if he had anywhere to go which he doesn't. He will be literally under this 24/7 armed security guard, with security cameras.

It's a proposal that was accepted by Judge Rakoff in a case I happened to have handled several years ago, the (indiscernible) case. The government disputes whether it's appropriate in this case.

We respectfully submit that on a full record it seems clear that the primary reason that he hasn't been released is financial. And so under the Second Circuit guidance, it's perfectly appropriate. There's nothing in the Bail Reform Act that says that this can't be done. He's willing to do it.

Frankly, I don't think it's necessary or if the government objects to it and the Court -- I'd be happy to have him released with the more standard condition of having electronic monitoring. I think that would be more than sufficient. But he's willing again to meet every concern and do whatever is necessary.

Now, the government has raised many issues that they characterize broadly as witness tampering. I'm not going to now address all of those. I'll reserve the

Proceedings

right to address some of them if the government, as I expect they will, raise them. I think I'll just make two points about it quickly.

Number one, they've also said on the record that none of that happened after 2019.

Number two, we adamantly disagree with their characterization that much of that activity is even remotely close to witness tampering, things like hiring a private investigator.

But in any event, there's no risk that activity will take place because he'll be in the home with the security guards with the videocameras and in addition, will agree to the communications monitoring provisions that were in place in the *Sabony* (phonetic) case in the Second Circuit. We'll do exactly what was done there so that his communications will, other than with counsel, will be recorded, will be monitored by the private security guards and the government will have access to it. There's no way that there'll be a risk with this proposal of flight and there's no way that there'll be a risk of danger to the community or tampering with any witnesses.

And again, in the civil case there were no such allegations. They all came, all those women came to court, they testified against him in open court. There

Proceedings

was nothing that came up during that trial that led Judge Cogan to have any concerns about Mr. Rubin's respect for the process. He respected it fully.

So we submit, Judge, he's got nowhere to go, he's got no ties to any other country, he has no relatives or real estate outside the United States. He's going to be under 24/7 surveillance. He's not a danger to the community. He hasn't been involved even on the government's account in any of this activity since 2019. And this bail package is more than reasonably designed to ensure his appearance. And we respectfully request that the Court order it be entered.

THE COURT: All right. Thank you. Ms. McGrath, do you want to be heard?

MS. MCGRATH: Yes, please, your Honor.

As the Court is aware, this is the fourth bail hearing and the defendant has recycled his arguments again and again and again.

And what's important to note is that of course there was a very lengthy proceeding before Judge Kuo in December when she had the benefit of these affidavits and she had the benefit of these financial statements and she found there that the defendant had not overcome the presumption.

The new packages not address the concerns that

Judge Kuo raised or that your Honor raised. And new facts have come to light that underscores that this defendant remains a significant danger and flight risk.

As an initial matter, the defendant asked the Court to commit error by imposing a condition precluded by the Second Circuit. In *Boustani*, the Second Circuit said in no uncertain terms the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails.

There, the Court held that condition is permissible only where "the defendant is deemed to be a flight risk primarily because of his wealth. In other words, a defendant may be released on such a condition only where but for his wealth he would not have been detained."

And in that case there's a white-collar defendant and the court found that the condition was impermissible because access to money was just one of many factors which included the seriousness of the charges, the strength of the evidence, the likelihood of a significant sentence, and also his deceptive actions.

Here, the defendant has been detained at each prior hearing on the basis of flight risk and danger not simply because of his wealth. Judge Kuo commented on the

strength of the case, the prospect of significant prison time, the defendant's evasive actions at the time of his arrest, and his danger to witnesses.

Your Honor likewise found that there was a lack of financial transparency, that the proposed suretors lacked moral suasion over this defendant, by his own account led a double life, and real concerns of flight risk and danger. And quoting from your Honor's opinion at page 33, "So I'm not confident that at this point this package will, and the family members as cosigners on this bond, will hold moral suasion over this defendant and assure this Court that he will appear in court as directed and not be a danger to the community or involve himself in witness intimidations."

And most recently in December Judge Kuo again found that in addition to all the prior considerations the defendant's shifting explanations and detail demonstrated a lack of trust and his inability to abide by any conditions of release. None of these factors depend on his wealth in a vacuum.

As Judge Caproni found in the *Alexander Brothers* case in the southern district, and as Judge Nathan found in the *Maxwell* case, because the defendant's wealth is not the sole or primary animating factor requiring his detention, this Court cannot impose the

private jail. And because that is a cornerstone of the defendant's proposal, that alone is a basis on which to deny this application.

We also want to highlight some new facts that have come to light since we were last before your Honor. As the Court will remember, the government seized seven cell phones at the time of the defendant's arrest, four of which were iPhones. One was his current iPhone, it is an iPhone 15. And two were new iPhone 16s in their boxes in Ziploc bags in separate places in the home. One was in a bag with a tent.

Before your Honor defense counsel argued with the defendant sitting next to him ignore this, these are old devices, counsel told him not to get rid of them, his grandkids play with them, nothing here.

After that proceeding, the defendant was on a recorded jail call with his wife and admitted actually like I heard rumors about this government thing in December or January and so I figured if I got picked up I would have a few new devices. It was a fundamental different answer than what was provided to the Court. The defendant allowed his counsel to lie to the Court in an effort to get bail.

And respectfully, if that were truly the explanation, I thought I might get arrested so I needed

an extra device, certainly the defendant wouldn't be purchasing two and keeping them in Ziploc bags in different places in his home, but that (indiscernible) explanation provided to the Court. That was not done here. Both the lie and the defendant's -- the fact that he kept two phones demonstrates his intent to flee.

There have also been new facts that have come to light about the defendant's wealth. And as Judge Kuo noted in the last proceeding, the pot of money we're talking about is growing significantly. The defendant is being very specific in referring to his ownership of -- his net wealth and disavowing ownership or certain things as assets.

But it's clear that what we care about is what's the overall pot of money that you have access to? Because that's was going to allow you to flee.

And in the initial bail hearing we were talking about primarily a life insurance policy worth $35 million. As your Honor will remember, between the first application and the second application, Mr. Gilbert called me and told me the Rubin policy, his own life insurance policy, is the only foreign policy to which he has access. At that time he expressly related the defendant does not have access to his wife's life insurance policy. As an aside, he didn't mention that

Proceedings

Rubin is a 70 percent beneficiary of his wife's policy. But in any event, he was drawing the distinction between Rubin's policy and his wife's policy.

Then the government came forward with his bank records showing the defendant getting disbursements from many different Crown Global policies. And only then did he admit oh actually he's also a trustee on the trust policy and in the last two years the defendant has taken loans of $7 million against those policies.

His refusal to come forward with the fact of his access to that money demonstrates his intent to flee and mislead the Court, Pretrial Services, and the government about his true access to wealth.

We do dispute the affidavits. We do not think that there has been a thorough accounting of the defendant's wealth. The exercise undertaken was giving the information provided by the defendant to his lawyers. They reviewed the bank records and come back with what they estimate to be the relevant factors.

Given the defendant's effort to already deceive the government about access to a foreign policy, we have no faith that we're at a true accounting and Judge Kuo likewise found the same.

We'll also note that the affidavits are very carefully worded. So they make reference to no

quote/unquote foreign property, no foreign cash, no foreign brokerage accounts, but they don't seem to account for his life insurance policies as foreign assets. And of course they're used as slush funds for the family and they are indeed located overseas. In none of the affidavits provided has anyone accounted for the trust policy which they value at about $13 million. That's entirely unexplained.

So now the government has no confidence that the affidavits accurately reflect the true picture of the money, the total universe of money to which this family has access, whether they're technically owners or simply beneficiaries or otherwise.

But even assuming this is accurate, even assuming that on their affidavits we have a full picture of their family's wealth, that reflects $136 million. Their proposal is a $75 million bond. They will have $71 million left even if Rubin absconds. That is generational wealth. Even assuming that that amount of money earned interest at 3 percent per year, that's millions of dollars. It would not financially devastate this family.

And as Judge Kuo focused on at the last hearing that would not create such severe damage that someone in Mr. Rubin's position considering whether to flee or stay

is certainly going to stay.

There's also been new evidence that's come to light as to Mary's complicity. As we noted to Judge Kuo, Rubin had been asking Mary and his daughter to send Zelle payments and cash payments to various individuals at the MDC to receive preferential treatment. One such example was that e asked her to send a Zelle payment so that he could be assigned to what he called the quiet floor and Mary attempted to send a $1,400 payment on October 2, 2025.

We've also seen evidence that Mary is complicit in Rubin's financial crimes with respect to the IRS. So what we discuss in our detention letter are emails between Rubin and Mary where they're discussing what to report to the IRS for some of their household employees' wages. And those are emails sent in early 2023 with respect to the fiscal year 2022 tax returns. And there are columns in a spreadsheet that Mary prepared indicating the reported W-2 wages and an actual salary of the employee. And the figures are fundamentally different with the actual salary being double what is reported, more than double.

And what we can see on Rubin's tax filing for that year, and my apologies, I think in our letter we note that it's a joint tax filing, it's actually just

Rubin's, but in any event what we see from Rubin's tax filing of that year is that the fake half wage is what's reported to the IRS. This is not an anomaly. There are numerous employees, household employees, for which they have consistently under reported assets including what we describe as employee two in our submission where this individual regularly received approximately $150,000 and what was reported to the IRS was a fraction of that.

Given Mary's willingness to engage in conduct to aid her husband to receive preferential treatment at the MDC and her complicity in the underlying crimes, certainly we do not think she's an appropriate suretor.

And I just want to note I think counsel said that there's uncontroverted evidence was his quote showing the defendant's deep ties to his family. As we note in our submission, for a decade day in and day out the defendant engaged in conduct extraordinarily detrimental to his family, detrimental to its obligations as a husband and a father. So we absolutely contest the suggestion that this person is now a loving and reformed father and husband who is going to take into consideration the best interests of his family before him.

Your Honor, there's also been new evidence that's come to light concerning obstruction and

tampering. One of the things we noted in our submission to Judge Kuo and will repeat again here is that in connection with the civil case in September 2017 when Rubin's co-defendant and Rubin first learned of the draft complaint, Rubin's co-defendant Jennifer Powers arranged for a junk removal company to clear out items from the penthouse. That is a penthouse that Rubin paid for and in which his belongings were stored. And the complaint detailed depraved conduct at that penthouse.

And the removal company was contacted that night and scheduled to remove workout equipment that they had to disassemble which we submit reflects the BDSM equipment stored in the dungeon.

Rubin and his co-defendant spoke that evening before she contacted the junk removal company and it was Rubin's credit card that paid for that junk removal company. So the suggestion given all that that he was somehow unaware of those efforts is belied by the record.

And irrespective of whether that resulted in any type of spoliation instruction in the civil case, what it shows to us is clear consciousness of guilt and obstructive conduct.

We also want to note an additional example from the civil case which is mentioned in our letter with respect to a co-conspirator three. This is an individual

who recruited women for Rubin including Jane Doe's eight and nine, and he was present when Rubin abused other individuals including victim three described in our letter when he inserted a pool cue into victim three's vagina.

They began texting when this individual learned of the civil case.  She indicated that she was going to get a new phone number and clear her chat histories and that everything was going to be discoverable.  And Rubin's response was check.

This individual was also scheduled to be deposed.  The day before she was scheduled to be deposed, Rubin wired her $5,000.  They met for drinks at the Four Seasons Bar.  And they ended the night saying, this is quoting from co-conspirator three, just have to say it's good seeing you and I missed your company in more ways than you know.  It's been nothing but amazing and I'm proud to call you a friend and lover.  Hashtag ride or die.  Later that evening she wrote love you, Howie, game face.  And he replied game face.  The morning of the deposition he indicated, "Give em hell."

And she perjured herself during the deposition. So quoting from the transcript at page 21.

"Q.   When was the last time that you spoke with Mr. Rubin?

"A.    Yesterday.

"Q.    What did you talk with him about?

"A.    We did not speak.  He wished me good luck today.

"Q.    Was this through a text or a call or something else?

"A.    Through a text."

Of course he would know that he just had drinks with her the day prior and so this was plainly a lie.

Your Honor, there are numerous examples of this which weren't featured in the civil case because of course the civil plaintiffs aren't going to be aware of this.  These are text messages that we the government have having conducted a search warrant at the defendant's home and seized his phone.  There are numerous tools available to the government that are not available to civil plaintiffs.

And so the suggestion that had there been anything untoward, Judge Kogan surely would have known about it is simply wrong.  He's only going to know about what the civil plaintiffs knew and we submit there is a vast universe of obstructive conduct about which the government is aware much of which we proffered choose the Court that never would have featured in the civil case because the litigants didn't have access to that

information.

In terms of the strength of the evidence, I won't belabor the point. All the arguments that defense counsel made were made before Judge Kuo. But of course the Second Circuit has affirmed a finding of liability in extraordinarily strong terms. Irrespective of the amount of money that was awarded, which we submit was very considerable, the jury plainly did not credit the defendant's account that this was consensual nor did the Second Circuit.

We've also identified additional victims since bringing these charges including since we were last before your Honor and we detail one in our submission. It's an individual who was never a party to any litigation. In fact, the defendant made her believe that given that she signed a settlement, she couldn't come forward to the police and she didn't do so for a very long time. But there, he hung that victim upside down, punched her breasts for over an hour. And the damage that she sustained was so severe that she had the most severe form of scar tissue encapsulating her implants. She couldn't be operated on for weeks until the swelling had resolved. And then she had to have, not only her implants, but also all the scar tissue around it removed. That is damage that the defendant caused with his fists

Proceedings

alone. He paid for that procedure. He received the medical records so he was aware of what he did. And notwithstanding that that happened in 2011, then he went on to do something extraordinarily similar to a victim in 2016.

The evidence in the civil case differs fundamentally from the evidence in the criminal case and we again expect that additional victims will continue to come forward and be featured in our own case.

So your Honor, we would submit that the evidence is plain that the defendant is a danger because he engaged in the decades long abuse of these women and that his instincts when faced with the prospect of being held accountable is to use financial and legal coercion and to engage in tampering whether directly or through others, and his risk of flight is considerable given his lies about his cell phones and his wealth, and also the likelihood of a very significant time in prison.

And apologies, there is one thing I would like to note on that. Our proffer with respect to the civil case is that it is a foregone conclusion defendant will be found guilty of the Mann Act transportation charges which simply requires that an individual was brought across state lines for the purpose of commercial sex.

As we outline in our submission, both the

defendant and his co-defendant Jennifer Powers had testified under oath at depositions and during trial that they engaged in that conduct. There is no dispute. So his guilt as to the Mann Act counts is a foregone conclusion.

Defense counsel claims that the defendant on those counts is facing a guidelines sentence of 33 to 41 months. They have not articulated how they arrived at that guideline calculation. But as we note in our submission, it depends on the defendant having an adjusted offense level of 20. And the only way we can get there is if he receives three acceptance points and no Chapter 3 enhancements, so no enhancements for being a leader or manager of an enterprise, no enhancements for vulnerable victims, no enhancements for an individual being restrained, all of which was definitively established in the civil case.

It is disingenuous to suggest that the defendant is sitting here thinking that he might face a prison term of 33 months. Certainly no plea has been offered. The government has no intention of offering the defendant a plea to Mann Act with a guideline range putting him at 20.

So unless the Court has any further questions for us at this time, we'll rest on our submission.

Proceedings

THE COURT: All right. Mr. Gilbert, do you want to be heard?

MR. GILBERT: Yes, I would. Thank you, your Honor.

I want to respond to several of the specific points but I guess in general I would say what we're not hearing from the government is what we are here to discuss which is is there something about the conditions that we've proposed that wouldn't address, even assuming you take their view of the evidence which we strongly disagree with, their allegations of witness tampering which we strongly disagree with? It's all old by their own account. I don't hear them saying anything different than that.

But the question is with these conditions is it reasonably designed to prevent any of that activity from happening ever again? And I think it's overwhelmingly clear that it would be impossible for this activity to happen again.

Number one, whatever occurred between him and women, their description, our description, it hasn't happened since 2019.

Number two, it's not going to happen when he's under 24 hour surveillance by private security guards or if the Court is concerned about the legality of that,

Proceedings

which we stand by our argument that it's perfectly lawful under these circumstances -- and in fact, I think the government has confirmed in spending much of the description talking about the financial situation. But in any event, he will be under electronic monitor, he'll be under full-time surveillance. He will have his communications monitored. There's really, there's no risk of any of that type of activity taking place. There's no risk of him tampering with witnesses if he can't contact any witnesses. He's under court order not to contact any witnesses.

So I think the fundamental points remain that we have presented a bail package that is overwhelmingly sufficient to address what the government has described as their concerns.

Now, to address some of the points more specifically, we perhaps have a disagreement about how the Mann Act guidelines would apply in this case. I think that's probably a fair statement. But there's no debating that there's no mandatory minimum. And even if their view of the guidelines differs from ours, it would be -- it's reasonable to say that the exposure on that is really under the 3553(a) factors and how Judge Kogan will view a conviction under the Mann Act given all of the evidence.

I don't think any of us would pretend to be able to predict how that would come out. We'd be guessing. But I think we can be certain that there would be no mandatory minimum and we can be certain that there are plenty of examples of recent cases, and the Mann Act is not charged all that frequently at all. In almost every case we could find it involved minors that are not involved here. But we're not talking about the type of exposure that, as the government suggests, just based on the Mann Act alone it would be almost irrational to do anything other than leave the country. That's just not the case.

They spent a fair amount of time again talking about victims based on activities that occurred. If I'm correct about to whom they were referring in 2011 and then in 2016, again, whatever the lurid nature of those allegations, however you describe them, at the very least they agree with us that it's really old activity and that there's nothing to suggest that with these bail conditions there's any risk of that activity happening again.

With regard to what they describe as new evidence about calling 1-800-JUNK, I think that issue has been fully litigated in the civil case. I don't think that what they described here is at all new. It is

undoubtedly the case that Judge Kogan denied the plaintiff's counsel's request for a spoliation instruction in that. There were photographs taken of what was in the apartment.

Frankly, he testified, and nobody denied, that there was BDSM activity taking place in that apartment which is frankly I think in part why the judge didn't grant the instruction. There was no reason to think that there would be a way to influence the outcome of a trial by, even if someone had devised a plan to remove BDSM equipment from the dungeon. Everyone knew and everyone agreed that there was BDSM equipment in that apartment. There's no debate about it.

I think frankly, the suggestion about Mary here, I'm struggling to find a word that's appropriate here, but I'll leave it at I think it's completely inappropriate the allegations they asserted here, number one.

Number two, they have absolutely no bearing on whether she could be a cosigner in this case. Putting her own family's wealth or her children's inheritance or grandchildren's inheritance at risk to support a bail package for her husband with whom she is in a divorce proceeding? To suggest that there was household help that was on the books but there was perhaps some of it

that wasn't paid, which I think is what the government is suggesting based on the email without any assertion about how much time anybody actually in fact worked I think has no place in this proceeding whatsoever. It's a completely inappropriate argument.

The argument about the Zelle payments, I think we've gone back and forth about that. I will leave it at this. I don't even think the government is suggesting that there was any payment made to any employee or any suggestion that an MDC employee was paid to move his floor from one place to another. He's been on the same floor since he got to the MDC. He met with his counselor. He's not had any problems in the jail. He's been a model prisoner with no disciplinary infractions whatsoever. So I think again, it's an example of the government looking for ways to distract the Court from the actual issues in this bail proceeding which is whether our package prevents him from fleeing and from imposing any risk to anybody.

With regard to the disclosures about the family trust, I'm puzzled by the government's assertion on that score because the affidavit that we submitted, Exhibit P to our letter, includes a paragraph in which Mr. Rubin, who signed this affidavit, referred specifically to I've been taking out funds from the family trust policy. So

it's all there on the record and all -- and to that point, that analysis that we did, those hundreds of hours spent poring over the financial records, those records almost entirely were materials that the government produced to us and that they had for years. So if they had some evidence from that that suggested that he was secreting money overseas to facilitate flight, they've had years to make that case. And even now they don't make it because they can't.

With regard to the allegation about the cell phones which I think also has been extensively debated, I mean to my mind to look at that scenario what is undeniably the case is that the one thing that he did not have in his home in Connecticut was a passport. So if someone was thinking oh I'm going to -- and he clearly knows he's under investigation whether that was a statement about the situation in the first bail hearing or it came in the second bail hearing, it was no effort to mislead anybody.

But the fact remains that he did know. He did meet with a lawyer to talk about what would happen in the event that he gets arrested. But to me that shows a lack of intent to flee. The upshot of that wasn't okay, you know, I expect this could happen, let me get some property overseas, let me figure out, you know, what

country I'm going to go to. It's completely consistent with that. And if somebody had in their mind that they wanted an escape hatch, they wanted to be able to leave the country, why on earth would the passport be in New York and he's living in Connecticut? It really, it just boggles the mind. It doesn't make any sense.

So I think on all of these points none of them frankly undermine the basic submission that we're making for the Court today which is that this is an extraordinary bail package I think by any account. $35 million in cash. I'm not aware of any law or precedent that suggests that the only way a bail package can be approved is that it would ensure the complete bankruptcy of a family if the defendant were to flee. $75 million is a significant amount in this context.

I think my understanding of your Honor's point initially was, you know, that I'm not sure if the package is substantial because yes, there are billionaires, right? There are multi-billionaire families. And yes, if you come forward with a $50 million, $70 million package and it's clear that families worth 100 billion dollars, you might say okay, this doesn't seem like this is going to have any impact.

That is not the situation here. So the amount is certainly significant, it's certainly substantial.

The penalty would be extreme.  The penalty would be incurred by his family members who would be left in the lurch which is the complete opposite of the life that he's been leaning since 2019 which is to take care of his family.

So for all those reasons, Judge, we think the bail package is more than sufficient.  It's reasonably designed to assure his appearance in court and we respectfully request that he be released on bail.

THE COURT:  Okay.  Ms. McGrath, anything else?

MS. MCGRATH:  Your Honor, very briefly.  I just want to address a few of the points counsel made.

In terms of the Zelle payments, what they show is that the defendant asked his wife, and she agreed, to pay someone who they thought had the ability and the authority to get him moved within the jail.  That's reflected on a jail call, that's recorded and the amount reflected in the Zelle payments.

And what Judge Kuo found at the last hearing, and this is in the transcript at page 49, "I don't have enough details about the Zelle payments and I'm not going to say those have proven for sure or in fact if they went to MDC employees.

"But I am concerned, and I think that's why the government brought this up, that Mr. Rubin also has not

only access to money, but access to individuals who are willing to help him do things eventually to perhaps reaching to the point of evading the law. And so that is another concern about his access to people to help him to again flee the country."

And your Honor, that is why the defendant and Mary's complicity in evading taxes with respect to their household help for many years in a very stark way is likewise relevant. It speaks to their character and their willingness to collude.

As to the trust, our point is this. The defendant was not forthcoming about it, represented to the government that he did not have access to it until confronted with other evidence. And even now, it's not accounted for in any of Rubin, Mary, or his daughter's calculations of their own net worth. So we don't know where that sits and we don't know if there are other foreign assets like that.

There is no requirement that the defendant secrete money overseas to have access to foreign assets that will enable his flight. That is a concern here. And the person who will have information about his foreign wealth is the defendant and he's not been forthcoming about that.

And finally, we'll just note with respect to

Proceedings

the overall dollar amount, we maintain that it is not at all substantial, that it would not create such severe damage to this family that the defendant's calculation will be to stay and fight these charges as opposed to fleeing.

And we'll note again in the *Maxwell* case Judge Nathan found that a $28.5 million bond with 22.5 million secured was insufficient where it would quote/unquote leave millions unrestrained.

Here we're not talking about millions. Here we're talking about $71 million.

So for all those reasons and those in our submission, we submit that the defendant's package should be denied.

THE COURT: All right, Mr. Gilbert, I'll give you the last word.

MR. GILBERT: Thank you, Judge. *Maxwell*, we're talking about an individual that had significant foreign ties, none of which apply here. The trust policy is attached to our submission and attached -- and the policy has a statement as of September 30, 2025 is attached to his affidavit. So I'm not sure why they don't understand what's in the trust. We've been completely forthcoming about it.

The question -- I think the suggestion is we

were asked what he owned. He didn't own the trust. It wasn't his policy. So that was information that we provided which was correct.

And so I don't see any of those points as moving the needle on the assessment of risk of flight or danger to the community in any way, shape, or form. Thank you.

THE COURT: All right. I'm not prepared to upset Judge Kuo's prior determination denying bail.

I do note that this is our fourth hearing on bail. There have been shifting stories. So I have to note with each further bail hearing the Court is less confident that this defendant will abide by the terms of his release if he were released on bail.

I note that the stories have been shifting over time and I am losing confidence as to the credibility that's presented to the Court.

I'm also troubled by the fact that there may be third parties that are assisting the defendant. So while the defendant himself may not engage in some of these activities that may violate the terms of any release, I'm concerned that there may be third parties out there that may assist him in that endeavor as well.

So I do consider him to be a risk of flight still and a danger to the community. I'm not prepared to

Proceedings

grant bail at this time.  Okay?

All right.  Anything else from the government we need to address today?

MS. MCGRATH:  No, your Honor.  Thank you.

THE COURT:  All right.  From the defendant?

MR. GILBERT:  No, thank you, your Honor.

THE COURT:  All right.  We are adjourned.

(Matter concluded)

-oOo-

**C E R T I F I C A T E**

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **March**, 2026.

_Mary Greco_
Transcriptions Plus II, Inc.